### EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

### CROMER FOOD SERVICES, INC., Defendant.

### C.A. No. 6:08–3249–HMH–BHH.

United States District Court,
D. South Carolina,
Greenville Division.

Feb. 26, 2010.

Kara L. Haden, Nicholas Glen Walter, Equal Employment Opportunity Commission, Charlotte, NC, for Plaintiff.

Sarah Ganss Drawdy, Drawdy Law Firm, Anderson, SC, for Defendant.

## OPINION & ORDER

HENRY M. HERLONG, JR., Senior District Judge.

This matter is before the court with the Report and Recommendation of United States Magistrate Judge Bruce Howe Hendricks, made in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 of the District of South Carolina.[1] Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), acting on behalf of Homer Howard ("Howard"), alleges causes of action for hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Defendant Cromer Food Services, Inc. ("CFS") filed a motion for summary judgment on July 10, 2009. After review,

---

1. The magistrate judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with this court. *See Mathews v. Weber,* 423 U.S. 261, 270–71, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). The court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions. *See* 28 U.S.C. § 636(b)(1) (2006).

the court grants CFS's motion for summary judgment.

## I. FACTUAL AND PROCEDURAL HISTORY

CFS is a "provider of industrial food services whose primary business is selling food and beverages through vending machines placed on [various] customers' premises." (Pl. Mem. Opp'n Summ. J. 2.) C.T. Cromer ("CT") is the owner of CFS. (*Id.*) Howard began working for CFS as a vending route salesperson in July 2006. (*Id.*) Howard worked second shift Monday through Friday, 3:00 p.m. to 11:00 p.m. (*Id.*) "Howard's vending route mainly involved restocking [CFS's] vending machines at Greenville Memorial Hospital [ ("GMH") ]." (*Id.*) "Howard would start by restocking the vending machines in the canteen located in the main lobby and then work his way up the different floors of the hospital according to a schedule set by [CFS.]" (Pl. Mem. Opp'n Summ. J. 3.)

During his time of employment with CFS, Howard alleges that he was sexually harassed by two male employees of GMH, John Mills ("Mills") and Andre McDowell ("McDowell"). (*Id.*) Mills and McDowell are housekeeping crew leaders at GMH. (*Id.*) Howard saw Mills and McDowell each day that he went to GMH to restock vending machines. (*Id.* at 4.) Howard alleges that the harassment allegedly began on or around December 4, 2006. (*Id.* at 3.) Howard contends "[t]he harassment by Mills and McDowell continued for approximately four months. The harassment consisted of sexual comments, sexual advances, and touching." (Pl. Mem. Opp'n Summ. J. 4.) "If Howard was running late, Mills or McDowell would comment about Howard being late and say they were 'worried about' him. Howard was bothered by the fact [that] Mills and McDowell were so familiar with his schedule. [He] felt like they were stalking him." (*Id.*) Howard also found it difficult to remove himself from the harassment because "[w]hen Mills and McDowell approached [him] . . . he was restocking the vending machines, [so he] was forced to stay in place because the vending machine was open." (*Id.*)

Howard alleges that "Mills and McDowell constantly made sexual comments to [him]" and the comments were made "every day." (*Id.*) Mills would often "follow Howard, whistle at him and make comments like 'you've got a nice walk.' " (*Id.* at 5.) Mills would also talk to Howard about giving and receiving oral sex from men and "would often touch or fondle himself" while speaking to Howard. (Pl. Mem. Opp'n Summ. J. 5.) "On February 13, 2007, Howard was at the [GMH's] gift shop purchasing a gift for his wife [when] Mills came up behind Howard, put his arms around [him] and said 'Oh Homer, I didn't know you loved me that much. You're buying me a Valentine's gift?' " (*Id.*) [2]

Howard alleges that he first reported the sexual harassment by Mills and McDowell to CFS's plant manager, Greg Adams ("Adams") on or around December 5, 2006. (*Id.* at 6–7.) Adams "laughed and told Howard 'it was just a joke' and 'let it go' " and "it's only guys goofing around." (*Id.*) Adams states that Howard complained to him about GMH employees making vulgar statements and sexual advances toward him but he did not perceive that to be a complaint about sexual harassment. (*Id.* Ex. 3 (Adams Dep. (22–23).) On or around December 8, 2006, Howard complained

---

**2.** Much of the explicit language quoted in the Report and Recommendation of the magistrate judge was stated by Howard at his deposition. However, as discussed more fully below, Howard did not provide such explicit details and examples when discussing the matter with his superiors at CFS. (Def. Mem. Supp. Summ. J. Ex. C (Howard Dep. 124–25).)

about the harassment to his direct supervisor, Brian Tyner ("Tyner"). (Pl. Mem. Opp'n Summ. J. at 7.) According to Howard, Tyner told him "it was just a joke not to take things serious." (*Id.*) "Around the end of December 2006, Howard complained to Chet Cromer [("Chet")], [CFS's] Senior Vice President. Chet said he would call" C.T. about the harassment. (*Id.*) "Howard complained to C.T. .... sometime in January and told him that the harassment by the hospital employees was getting worse." (*Id.* at 8.) Howard alleges that C.T.'s response to his complaints was, "I'm not responsible for the hospital. I'm only responsible for CFS." (*Id.*) "Howard [allegedly] met with C.T. at least two more times about the sexual harassment." (Pl. Mem. Opp'n Summ. J. 8.) C.T. alleges that he first learned of the harassment in March 2007. (*Id.* Ex. 1 (C.T. Dep. 121–22).)

Howard also reported the harassment to Ronnie Galloway, operations manager at GMH, and Pat Leach ("Leach"), GMH's manager of environmental services. (*Id.* at 10.) "The harassment stopped for about two days, but then continued." (*Id.*) Howard alleges that the "sexual harassment had an emotional impact" on him, he "lost weight, could not sleep, and was unable to eat." (*Id.* at 6.) The harassment also "affected Howard's social life and his marriage." (Pl. Mem. Opp'n Summ. J. 6.)

On March 6, 2007, Howard filed a charge of discrimination against CFS with the EEOC. (*Id.* at 10.) "On March 23, 2007, Howard reported to work and ... Adams told him not to clock in because C.T .... wanted to see him. During the meeting, [C.T.] handed Howard a memorandum notifying [him] that he was being assigned to a first-shift driver route effective immediately." (*Id.* at 10–11.) According to the memorandum, CFS had "only one 2nd shift position servicing vending machines" therefore Howard was being "offered a 1st shift position beginning Monday March 26, 2007." (Def. Mem. Summ. J. Ex. D (Job Offer Letter).) C.T. concedes that CFS received paperwork explaining that Howard had filed a charge of discrimination with the EEOC prior to his meeting with Howard on March 23, 2009. (Pl. Mem. Opp'n Summ. J. Ex. 1 (C.T. Dep. 148–49).) Howard alleges that on March 22, 2007, C.T. "told [him] that he 'got his stupid letter' from EEOC." (*Id.* at 12.) Howard also contends that he "was aware of another second shift route driver position where the driver had quit." (*Id.* at 11.) C.T. alleges, however, that the first-shift position was all that was available to Howard. (*Id.* Ex. 1 (C.T. Dep. 149).) Howard alleges that he was "unavailable" to work the first shift. (*Id.* Ex. 2 (Homer Dep. 76).) Consequently, Howard quit his job shortly after the March 23, 2007 meeting.

The EEOC filed a complaint against CFS on September 24, 2008. CFS filed a motion for summary judgment on July 10, 2009. On July 28, 2009, the EEOC filed a memorandum in opposition to CFS's motion for summary judgment. On January 6, 2010, Magistrate Judge Hendricks submitted a Report and Recommendation recommending that the court deny CFS's motion for summary judgment. (Report and Recommendation 20.) CFS filed objections to the Report and Recommendation on January 25, 2010. The EEOC filed a reply to the objections on February 11, 2010. The court held a hearing on February 23, 2010.

## II. Discussion of the Law

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c)(2). Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in the nonmovant's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. 2505.

Moreover, "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2).

### B. Objections

■■■■ CFS filed objections to the Report and Recommendation. Objections to the Report and Recommendation must be specific. Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge. *See United States v. Schronce,* 727 F.2d 91, 94 & n. 4 (4th Cir.1984). In the absence of *specific* objections to the Report and Recommendation of the magistrate judge, this court is not required to give any explanation for adopting the recommendation. *See Camby v. Davis,* 718 F.2d 198, 199 (4th Cir. 1983).

CFS filed two specific objections to the magistrate judge's Report and Recommendation. CFS alleges that the magistrate judge erred (1) "in finding that Plaintiff has stated [a] claim of imputed liability ... based on the alleged sexual harassment of [Howard] by two employees of [GMH]," and (2) "in finding that Plaintiff has stated a *prima facie* case of retaliation because Plaintiff has not and cannot show any adverse employment action was taken against Howard." (Objections 1–2.)

### 1. Hostile Work Environment Claim

■■■■ First, CFS objects to the magistrate judge's conclusion that the EEOC has stated a claim for hostile work environment. (*Id.* at 1–5.) To survive summary judgment on a hostile work environment claim, a plaintiff must demonstrate that (1) the alleged harassment was unwelcome, (2) based on his sex, (3) "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere," and (4) "there is some basis for imposing liability on [the Defendant.]" *See Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183–84 (4th Cir.2001) (internal quotation marks omitted). CFS asserts that it "had no authority or control over [GMH] employees Mills and McDowell, the purported harassers. [It] could not fire, suspend, counsel, or discipline Mills or McDowell in any fashion." (Def. Mem. Supp. Summ. J. 2.) Accordingly, CFS argues that there is no basis for imputing liability for Mills and McDowell's actions to CFS.

■■■■ It is undisputed that Mills and McDowell are not CFS employees, rather they are employees of GMH, a customer of CFS. However, according to EEOC Guidelines, "[a]n employer may ... be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees)

knows or should have known of the conduct and fails to take immediate and appropriate corrective action." 29 C.F.R. § 1604.11(e).[3] "While the EEOC Guidelines are intra-agency guidelines not binding on federal courts, they are nevertheless entitled to deference in the courts." *Magnuson v. Peak Technical Servs., Inc.,* 808 F.Supp. 500, 512–13 (E.D.Va.1992). "The courts have, in fact, recognized and adopted the EEOC Guidelines, or portions thereof, in several sexual harassment cases." *Id.* at 513 n. 8.

■ Nevertheless, the United States Court of Appeals for the Fourth Circuit has yet to address the application of § 1604.11(e) in the context of an employer's liability for sexual harassment by a non-employee. Other courts, however, have consistently cited § 1604.11(e) for the proposition that "an employer may be responsible for sexual harassment based upon the acts of nonemployees." *Turnbull v. Topeka State Hosp.,* 255 F.3d 1238, 1244 (10th Cir.2001); *Lapka v. Chertoff,* 517 F.3d 974, 984 n. 2 (7th Cir.2008) ("Employer liability can be imposed when the harassment is committed by ... third parties."); *Watson v. Blue Circle, Inc.,* 324 F.3d 1252, 1258 n. 2 (11th Cir.2003) ("An employer may be found liable for the harassing conduct of its customers ....."); *Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 968 (9th Cir.2002) ("In this circuit, employers [may be held] liable for harassing conduct by non-employees.... The [EEOC] Guidelines endorse this approach.").

■■ In determining whether an employer is liable for the harassment by non-employees, courts ask "whether the [employer] fail[ed] to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *Turnbull,* 255 F.3d at 1244 (internal quotation marks omitted). "The focus is not on the conduct itself but on the employer's behavior in response." *Id.* In essence, the courts apply a negligence analysis which is "divided into two separate inquiries, looking first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses." *Id.* (internal quotation marks omitted). "Even if the remedial action does not stop the alleged harassment, it is 'adequate' if it is 'reasonably calculated' to end the harassment." *Guthrie v. Baker,* 583 F.Supp.2d 668, 678 (W.D.Penn.2008).

■ The negligence analysis set forth by courts that have applied § 1604.11(e) to cases involving sexual harassment by non-employees is similar to the standard the Fourth Circuit applies in cases of sexual harassment by a coworker. *See Howard v. Winter,* 446 F.3d 559, 567 (4th Cir.2006) ("In order to determine whether the Navy was entitled to summary judgment, we must determine when the Navy had actual or constructive notice of McCall's alleged harassing behavior and whether the Navy's response was reasonable once such notice was provided."). As such, the court finds that CFS may be held liable for the actions of non-employees Mills and McDowell only if, after having actual or constructive knowledge, it failed to provide an adequate remedy to the alleged harassment. The court, however, finds that CFS

---

**3.** While § 1604.11(e) references "sexual harassment of employees in the workplace," this provision has been read to extend outside of the workplace where an employee's job duties are performed away from the employer's premises. *See E.E.O.C. v. Fed. Exp. Corp.,* No. C94–790C, 1995 WL 569446, at *3 (W.D.Wash. Aug. 8, 1995) (unpublished) ("FedEx cannot escape the dictates of Title VII on the fortuitous ground that its employees are couriers whose duties take them onto the premises of FedEx customers.")

provided an adequate remedy in offering Howard a transfer to the first-shift position.

While it is undisputed that a number of Howard's superiors at CFS were aware of the alleged harassment by GMH employees, there is a factual dispute regarding *when* Howard's superiors were made aware of the severity of the harassment. Nevertheless, the court finds that this is not a material dispute. Upon viewing the facts in the light most favorable to the EEOC, the court finds that CFS provided a remedy after becoming aware of the severity of the harassment. The EEOC alleges that Howard reported the harassment to Adams, CFS's plant manager, in December 2006. During his deposition, however, Howard stated that when he spoke with Adams he did not provide any examples of the type of behavior that offended him:

> Q: Did you tell anyone at CFS *the extent of the harassment?* What actually was happening? Or did you just tell them, "I'm being sexually harassed"?
>
> A: I reported to Greg Adams and I told him that "There is some gentlemen at the hospital that's really getting vulgar, getting very obnoxious. They're always talking about sex." And, again, the only reply I got was a laugh. "Oh, Homer, they're only joking." And that's as far as the conversation got.
>
> Q: Did you ever give Greg or anyone else any examples of what was happening and why you felt it went beyond joking?

> A: I don't understand what you mean by example.
>
> Q: Like you've been doing here today, *telling specifically what they did?*
>
> A: No.
>
> Q: Did you ever give them any more information so that they could know if it was joking or if it went beyond joking to the level of sexual harassment?
>
> A: No. I never ... all I told them was I was being sexually harassed at a hospital.

(Def. Mem. Supp. Summ. J. Ex. C (Howard Dep. 124–25) (emphasis added).) Accordingly, Howard never provided any of the CFS employees with specific details of the purported sexual harassment.[4] Nevertheless, in March 2007, CFS was made aware of the severity of the harassment when Howard filed a charge with the EEOC. On March 23, 2007, CFS responded to Howard's allegations by offering him a transfer to a first-shift position.

CFS alleges that "the *only* corrective action available [to Howard] in light of the alleged sexual harassment ... by non-employees [was] a proposed transfer of Howard to first-shift on the same terms and conditions of employment available to any other first-shift vending route salesperson." (Objections 1–2.) The EEOC does not dispute that the first-shift transfer would have prevented Howard from having any interaction with McDowell and Mills.[5] CFS may only be held liable if it "fail[ed] to remedy or prevent a hostile or offensive work environment." *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1074 (10th

---

4. The court also notes that Howard alleges that he "complained to Mills' and McDowell's supervisor ... that [they] were sexually harassing him.... The harassment stopped for about two days, but then continued." (Pl. Mem. Opp'n Summ. J. 10.) The EEOC contends that CFS should have complained to GMH about the alleged sexual harassment,

however, GMH had already been notified about Howard's complaints yet the harassment continued.

5. The court will address the EEOC's allegation that this first-shift transfer was an adverse employment action under the retaliation claim discussion.

Cir.1998) (quoting *Hirschfeld v. New Mexico Corrections Dep't*, 916 F.2d 572, 577 (10th Cir.1990)). "The [court's] focus is . . . on . . . the employer's behavior in response." *Turnbull*, 255 F.3d at 1244. After learning about the extent of the alleged harassment, CFS provided Howard with an alternative work assignment that remedied and prevented further sexual harassment from the GMH employees. Accordingly, the court finds that the EEOC has failed to show a genuine issue as to any material fact regarding the hostile work environment claim and grants CFS's motion for summary judgment as to the hostile work environment claim.

## 2. Retaliation Claim

Next, CFS objects that the magistrate judge erred "in finding that Plaintiff has stated a *prima facie* case of retaliation because Plaintiff has not and cannot show any adverse employment action was taken against Howard." (Objections 2.) The magistrate judge concluded that "genuine issues of fact remain as to the [EEOC's] retaliation claim such that dismissal is improvident." (Report and Recommendation 19.) CFS, however, argues that summary judgment should be granted on the EEOC's retaliation claim because the EEOC cannot establish an adverse employment action taken against Howard. (Objections 5.)

■ Title VII's antiretaliation provision forbids employer actions that "discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . . ." 42 U.S.C. § 2000e–3(a). In order to establish retaliation, the EEOC must show "(1) that [Howard] engaged in protected activity[6]; (2) that [CFS] took adverse employment action against h[im]; and (3) a causal connection existed between the protected activity and the adverse action." *McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir.1991). CFS argues that the EEOC cannot establish the second and third elements regarding an adverse employment action. (Objections 6.)

■ In order to establish an adverse employment action taken by an employer, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal quotation marks omitted). This standard is "phrase[d] . . . in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.*

■ The EEOC alleges that CFS's "transfer of Howard to a different shift" was an adverse employment action in retaliation of Howard filing a charge of discrimination with the EEOC. (Pl. Mem. Opp'n Summ. J. 24–25.) The EEOC contends that the transfer was an adverse employment action because

> Howard would have sustained a per hour decrease in wages and an increase in the number of hours he was required to work as a result of the transfer. C.T . . . . gave Howard an ultimatum, telling him "Either you take [the transfer] or you're done." Howard told C.T . . . . he could not take the shift [because] he has young children, one of whom had a med-

---

**6.** The EEOC alleges that CFS retaliated against Howard after he "complained to [CFS and GMH] about sexual harassment and after Howard filed a discrimination charge with the [EEOC]." (Compl. ¶ 8.)

ical condition, and Howard needed to be available to transport the child during the day.

(*Id.* at 25.) Prior to offering Howard the first-shift position, Howard had told C.T. "that he could only work second shift." (*Id.* at Ex. 1 (C.T. Dep. 93).) Accordingly, the EEOC argues that CFS's actions presented Howard with no other option than to resign. (*Id.* at 25.)

The EEOC also alleges that there is a "causal link between [Howard's] protected activity and the adverse employment action." (*Id.* at 26.) The EEOC alleges that C.T. "received a copy of Howard's EEOC Charge and the Notice of Charge no more than one week prior to his meeting with Howard on March 22, 2009." (Pl. Mem. Opp'n Summ. J. 27.) C.T. concedes that "some paperwork [was] sent to us" regarding Howard's EEOC charge prior to the March 23, 2009 meeting. (*Id.* Ex. 1 (C.T. Dep. 149).) Additionally, after learning about the EEOC charge, C.T. asked Howard, "What is your complaint? I mean, what is your grievance? What did I not do you were not happy with?" (*Id.* Ex. 1 (C.T. Dep. 164).) Moreover, according to C.T., he received the paperwork regarding Howard's EEOC charge "within a few days or a week" of offering Howard the first-shift position. (*Id.* Ex. 1 (C.T. Dep. 165).)

CFS argues that the offer to transfer to the first shift was not an adverse employment action, rather it was the only option available to cure Howard's complaints of sexual harassment. (Objections 6.) As discussed above, CFS asserts that the "only *reasonable* way in which [it] could end the alleged harassment of Howard by non-employees at [GMH] was to move Howard to first-shift." (*Id.*) The EEOC alleges that Howard "could not take the shift ... because he has young children, one of whom had a medical condition, and Howard needed to be available to transport the

child during the day." (Pl. Mem. Opp'n Summ. J. 25.) "The mere fact that a new job assignment is less appealing to the employee ... does not constitute adverse employment action." *James v. Booz–Allen & Hamilton, Inc.,* 368 F.3d 371, 376 (4th Cir.2004). "A reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." *Id.* (internal quotation marks omitted). While the first shift would require an increase in the number of hours Howard would work each week, it also offered more pay. (Def. Mem. Supp. Summ. J. 10.) "[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Id.*

The first-shift position would have required Howard to work from 4:00 a.m. until 3:30 p.m. Howard has provided the court with no evidence that he could not transport his child to necessary doctor appointments in the afternoon following the first shift. At oral argument, the EEOC conceded that, as it relates to Howard's family situation, the only drawback to the first-shift position was that it might interfere with his ability to take his child to the doctor. Howard's wife is a stay-at-home mother who does not drive. There is no evidence that Howard would be unable to schedule a doctor's appointment for his child after Howard's shift ended at 3:30 p.m. Moreover, Howard has failed to present evidence that he would be unable to leave work if an emergency arose. Additionally, according to the evidence presented during the hearing on the motion, Howard was less than four months away from being eligible to receive leave benefits from CFS which would accommodate his need to leave work to transport his chil-

dren if necessary. Accordingly, the EEOC has failed to establish that the transfer to first shift was an adverse employment action and that it was taken in retaliation for Howard filing an EEOC charge. As such, the court grants CFS's motion for summary judgment as to the retaliation claim.

As to both claims, the hostile work environment and retaliation claims, the determining factor is the same—whether CFS provided an adequate remedy to the hostile or offensive work environment. The superiors of the offending third parties were made aware of the harassment, yet the conduct continued. According to Howard, CFS was aware that he complained to GMH about the harassment. At that time, when the transfer was offered, CFS was in a "catch–22" position. CFS could have additionally contacted GMH to try and stop the offensive conduct. However, given that the conduct continued after GMH was notified about the harassment by Howard, the only definitive cure for CFS was to offer the first-shift transfer. If, hypothetically, the harassment continued after CFS had contacted GMH, Howard could have quit his job and complained that CFS constructively discharged him for failing to provide him an alternative work assignment.

Based on the foregoing, the court grants CFS's motion for summary judgment.

Therefore, it is

**ORDERED** that CFS's motion for summary judgment, docket number 47, is granted.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

BRUCE H. HENDRICKS, United States Magistrate Judge.

This matter is before the Court on the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 and motion to dismiss pursuant to Federal Rule of Civil Procedure 12. [Doc. 47.] The plaintiff EEOC, on behalf of Homer Howard, has plead claims for hostile work environment, on account of Howard's sex, and for retaliation, pursuant to Title VII of the Civil Rights Act of 1964, as amended. The Court will refer interchangeably to the EEOC and Howard as "the plaintiff."

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

### FACTS PRESENTED

The defendant is a provider of industrial food services, whose primary business is selling food and beverages through vending machines placed on the customer's premises. (Cromer Dep. at 31–32.) C.T. Cromer is the defendant's owner and chairman of the board. *Id.* at 30–31.

The plaintiff was hired as a second-shift route driver at the defendant's Anderson facility in July 2006. *Id.* at 44. He worked from 3:00 to 11:00 p.m., Monday through Friday. *Id.* The plaintiff's vending route mainly involved restocking the defendant's vending machines at Greenville Memorial Hospital ("Greenville Hospital"). (Cromer Dep. at 45.)

The plaintiff contends that, during his employment with the defendant and while performing his duties at the hospital, he was sexually harassed by two male employees of Greenville Hospital, John Mills and Andre McDowell. (Pl. Dep. at 25, 28, 120.) Mills and McDowell were not employees of the defendant nor did they have any supervisory role over the plaintiff. Starting on or around December 2006, the plaintiff alleges that Mills and McDowell

began harassing him about his sexual orientation, discussing their own sexual desires concerning the plaintiff, and making some sexual gestures in the plaintiff's presence. The precise details of Mills' and McDowell's alleged conduct will be discussed in more detail *infra*. In short, they allegedly suggested he was gay, propositioned him, discussed anal and oral sex, and at least one of the two individuals fondled themselves in the plaintiff's presence. (Pl. Dep. at 36–37, 86–87, 120–22.) The plaintiff alleges an unwanted touching on at least one occasion when Mills purportedly put his arms around the plaintiff and said "Oh, Homer. I didn't know you loved me that much. You're buying me a Valentine's gift?" The plaintiff became angry and loudly told Mills "don't put your hands on me" and "I wish you'd get the hell out of my face." *Id.* at 78–80.

Around December 5, 2006, Howard complained to the defendant's Plant Manager, Greg Adams, about the sexual harassment by Mills and McDowell. (Pl. Dep. at 45–46.) The plaintiff has put forward other evidence that he continued to complain about the harassment, including to Cromer. (Howard Dep. at 45–48, 51, 54, 58, 112–113, 124; Adams Dep. at 22–23; Cromer Dep. at 12, 75–76, 124–125, 128–129.) The plaintiff contends, however, that his complaints were laughed at, dismissed, and ignored. (Pl. Dep. at 46–47, 54, 58–59, 112.)

On March 6, 2007, the plaintiff filed a charge of discrimination against the defendant with the Equal Employment Opportunity Commission. (Pl. Ex. 11.) On March 23, 2007, after reporting to work, Cromer handed the plaintiff a memorandum notifying him that he was being assigned to a first shift driver route effective immediately. (Pl. Dep. at 65, Def. Ex. D, G.) The plaintiff contends that he was told that he had to take the shift transfer or that he would be fired. (Pl. Dep. at 71–72.) The plaintiff claims that the new shift would not accommodate his serious child-care responsibilities. When the plaintiff inquired about some alternative shift arrangement, he was allegedly told to "take it or leave it." (Pl. Dep. at 76.)

It appears that the plaintiff, thereafter, quit his employ with the defendant.

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257, 106 S.Ct. 2505. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no

genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the nonmoving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324, 106 S.Ct. 2548. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## DISCUSSION

### I. Hostile Work Environment Claim

The plaintiff first contends that the actions of Mills and McDowell created a hostile work environment for which the defendant is liable.

To establish a hostile work environment claim, the plaintiff must prove by a preponderance of the evidence that he was subjected to (1) unwelcome harassment; (2) based on his sex; (3) that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive atmosphere; and (4) that is imputable to the defendant. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001). The defendant contends that the plaintiff cannot establish either the third or the fourth elements of his prima facie case.[1]

#### 1. Severe or pervasive

The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d

---

1. The defendant does not contest that the alleged harassment was on account of the plaintiff's sex and, therefore, that issue need not be addressed by the Court. The Court would note, however, that the fact that this case involves alleged same-sex harassment is no bar to a claim that the alleged conduct was on account of the plaintiff's sex. *See Oncale*, 523 U.S. at 79, 118 S.Ct. 998. And, sexual desire is not a *per se* requisite showing. *Id.* at 80, 118 S.Ct. 998. Notwithstanding, issues of fact exist as to the "on account of sex" requirement of the claim insofar as the plaintiff has testified that he believes the harassment by Mills and McDowell was, in fact, motivated, in part, by sexual desire. (Howard at 34, 37, 80, 87, 115.) Mills apparently has testified that he has sex with both men and women and that his most recent relationship was with a man. (Mills Dep. at 23–24.) McDowell, however, denies that he has ever had sex with men. (McDowell Dep. at 15.)

325, 333 (4th Cir.2003) (en banc). First, the plaintiff must show that he "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Next, the plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment objectively hostile or abusive. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

As to the subjective element, the defendant's only contention is that the plaintiff, because of the nature of his work, had the ability to "walk away" from the offending individuals and their comments. (Pl. Dep. at 86–87.) The defendant would emphasize that the plaintiff was never around other employees long enough to converse with them. *Id.* at 92. By extension, the Court supposes the defendant to mean that the conduct cannot be considered subjectively severe or pervasive because the plaintiff could escape it.

Issues of fact exist as to the plaintiff's subjective impression. The plaintiff has responded with evidence that he repeatedly complained about the harassment (Pl. Dep. at 45–51, 54, 56–58, 94–96, 124); that he told Mills and McDowell to leave him alone and to stop touching and verbally harassing him, *id.* at 26, 33, 37, 78–80; and that the harassment, in fact, emotionally affected him, *id.* at 99, 101. A reasonable jury could conclude, based on this evidence, that the plaintiff subjectively perceived the harassment as severe or pervasive. *See, e.g., Spriggs*, 242 F.3d at 185–86 (finding a victim's complaints to supervisors about harassment shows he believed the environment was hostile or abusive).

As to the objective severity of the harassment, it "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" giving "careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81, 118 S.Ct. 998; *see also Harris*, 510 U.S. at 23, 114 S.Ct. 367 (warning whether a hostile environment actually existed "can be determined only by looking at all the circumstances"). "There is no mathematically precise test" for determining when a hostile or abusive work environment exists. *Harris*, 510 U.S. at 22, 114 S.Ct. 367. The circumstances that should be considered include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir.2008). But, "'no single factor is' dispositive." *Sunbelt*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367).

In order to be actionable, the harassing "conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). The Fourth Circuit has "recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." *Id.* It has stated, therefore, that the "task then on summary judgment is to identify situations that a reasonable jury might find ... where the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere." *Id.* (quoting *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th Cir.2007)). The plaintiff reminds that "whether harassment was sufficiently severe or pervasive to create a hostile work environment is 'quintessentially a question of fact'"

for the jury." *Conner v. Schrader–Bridgeport Int'l, Inc.,* 227 F.3d 179, 199–200 (4th Cir.2000) (quoting *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 243 (4th Cir. 2000)).

The plaintiff has put forward the following evidence that the harassment was objectively severe and pervasive. Mills made sexual gestures towards the plaintiff; asked the plaintiff to come to his house; and asked the plaintiff to meet him in the Pediatric Intensive Care Unit after hours, implying that the two men would have a sexual encounter. (Pl. Dep. at 120–121.) Mills would talk about his experiences giving and receiving oral sex from men. *Id.* at 86–87, 121. Mills would touch and fondle himself while making sexual comments to the plaintiff. *Id.* at 121. Mills would follow the plaintiff, whistle at him, and make comments like "you've got a nice walk." *Id.* at 36. Mills told the plaintiff that he enjoyed "sucking the meat off the bone." *Id.* at 32–33. McDowell made frequent comments to the plaintiff that he (McDowell) liked anal sex. *Id.* at 122. McDowell also told the plaintiff that he (McDowell) was "the female [in a two-male couple]." *Id.* Mills asked the plaintiff for something hard to put in his mouth because he needed something to suck on. *Id.* at 120. Mills would often tell the plaintiff about his sexual fantasies. *Id.* at 36–37. And, as discussed, there was at least one incident of unwanted touching. *Id.* at 78–80.

As to the frequency of the conduct, admissible evidence suggests that the plaintiff had contact with Mills or McDowell on every day he worked at the hospital, *id.* at 30; every conversation with Mills and McDowell was of a sexual nature, *id.* at 123–24; and sexual harassment occurred virtually every day over an approximate four month period, (Howard Decl. ¶ 3, 4). The alleged frequency is fairly dramatic. The plaintiff has flatly testified that every single conversation with both Mills and McDowell was sexual and that such conversations happened one or two times every day.

As to the severity of the alleged harassment, the Court thinks a jury could find the comments fairly severe. The incidents involve strongly course language, which directly implicates the plaintiff in sexual conduct with the alleged harassers. The plaintiff also alleges more than course talking, including physical gesturing and the groping of genitalia. Concerning whether the conduct was physically threatening or humiliating, the plaintiff testified that the conduct was so persistent and unrelenting that he felt as though he were actually being stalked. (Pl. Dep. at 36.) The defendant's owner, C.T. Cromer, stated he was "scared" for the plaintiff when the plaintiff described what was going on at the hospital and that he believed the plaintiff was in "harm's way." (Cromer at 203–204.) Cromer expressed particular concern for the plaintiff when it was necessary for him to be at the hospital at night. *Id.*

Lastly, there is evidence that the conduct may have unreasonably interfered with the plaintiff's actual work performance. Contrary to the defendant's assertion that the plaintiff was able to flee Mills' and McDowell's alleged commentary, the plaintiff testified that while he would try to do so, in practice he could not, because "[w]hen you've got a vending machine hanging open and there's money exposed, it takes time to get that machine shut down, locked up and secured, and it takes a lot of time to get the machine set back to get it closed up." (Pl. Dep. at 86–87.) The plaintiff believably recounted that "[a] lot of comments and gestures can be made in that amount of time." (Howard at 86–87.) Implicitly, the plaintiff is, therefore, suggesting that he was rushed and intimidated in his work and that the affect of the

alleged harassment was to literally alter the schedule and pace of the performance of it.

To the Court, all of the *Harris* considerations are present, although to varying degrees, and constitute serious indicia of objectively severe and pervasive harassment. The record includes evidence that the harassers (1) went "out of their way to disgust [him] and make [him] uncomfortable by graphic demonstrations of sexual acts," *Ocheltree*, 335 F.3d at 328; (2) subjected him to what a reasonable individual may have considered demeaning remarks about his sexual orientation, *see Spriggs*, 242 F.3d at 184–86 (racial epithets); *Sunbelt Rentals*, 521 F.3d at 311 (religious epithets); and (3) subjected him "to frequent comments about [his] body" and their own bodies, *see E.E.O.C. v. R & R Ventures*, 244 F.3d 334, 337–38 (4th Cir. 2001). *Ziskie v. Mineta*, 547 F.3d 220, 228 (4th Cir.2008). Based on the quality, quantity, and frequency of the remarks, issues of fact exist as to whether the conduct was severe or pervasive.

### 2. Imputed Liability

It is undisputed that the alleged harassers had no employment relationship of any kind with the defendant and had no supervisory role in relation to the plaintiff. McDowell and Mills, however, were employees of Greenville Hospital, which is the defendant's largest client. (Pl. Dep. at 25; Cromer Dep. at 47–48.) It appears that an employer may be responsible for a *non-employee's* sexual harassment of an employee where the employer knows or should have known of the conduct and failed to take immediate and appropriate corrective action. *See* EEOC Guidelines, 29 C.F.R. § 1604.11(e) (employer may be responsible for acts of non-employee where employer "knows or should have known of the conduct and fails to take immediate and appropriate corrective action"); *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 n. 2 (11th Cir.2003) (observing employer may be liable for harassing conduct of its customers); *Turnbull v. Topeka State Hospital*, 255 F.3d 1238, 1244 (10th Cir.2001) (stating "employer may be responsible for sexual harassment based upon the acts of nonemployees"); *Lockard v. Pizza Hut*, 162 F.3d 1062, 1073 (10th Cir.1998). The defendant does not really contend otherwise. (Mem. Supp. Summ. J. at 6.)

The Fourth Circuit has stated that an employer is liable for sexual harassment by a non-supervisor if "it knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree v. Scollon Prod., Inc.*, 335 F.3d 325, 331 (4th Cir.2003). This rule tracks the language of the Guidelines and the law of other circuits in regards to liability for the harassing conduct of non-employees. Although it does not appear that the Fourth Circuit has precisely considered it, at least one district court in this Circuit has concluded that it is proper to impute liability for the harassing conduct of non-employees, under circumstances where the defendant had knowledge of the harassment, actual or constructive, and failed to take prompt remedial action. *See McGuire v. Commonwealth*, 988 F.Supp. 980, 988 (W.D.Va.1997), *overruled on other grounds by Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 436 (4th Cir.1998).

The plaintiff has submitted admissible and substantial evidence that the defendant had actual notice of the harassment. (Howard Dep. at 45–48, 51, 54, 58, 113, 124.) Additionally, the defendant's Plant Manager, Greg Adams, and the Owner, C.T. Cromer, each have admitted that the plaintiff complained to them about sexual harassment. (Adams Dep. at 22–23; Cromer Dep. at 12, 75–76, 124–125, 128–129.)

The defendant responds that the plaintiff's reports of sexual harassment were incomplete, non-specific, and vague and did not give the defendant sufficient notice of the severity of the conduct alleged. The characterization is not persuasive. The Court need not recount the plaintiff's full testimony here. The deposition pages cited above create clear issues of fact as to the quality of the plaintiff's notice, whether it was repeated, specific, and clear. Even the deposition excerpts quoted by the defendant, in its memorandum in support, evidence attempts by the plaintiff to describe the harassment suffered but which were rejected by the defendant as not a problem for which it had any responsibility. (Mem. Supp. Summ. J. at 7; Pl. Dep. at 113–14.) The defendant makes a point of emphasizing that the plaintiff never relayed the specific substance of any harassing comments. But as the defendant itself has recited in its own brief, the plaintiff expressly said he was being "sexually harassed" and that Adams' response was that the plaintiff needed to "[q]uit being a crybaby. They're only teasing you." (Mem. Supp. Summ. J. at 8; Pl. Dep. at 124–25.) A jury could easily and reasonably find that the plaintiff gave as complete a notice of the harassment as would ever be expected. But, even to the extent that the contents of the plaintiff's notice was somehow deficient, a jury would have a basis, and should be given the opportunity, to conclude that such inadequacy was a function of the defendant's own resistance to it.

If the plaintiff's notice is found legally effective, the defendant can only avoid liability by demonstrating that it took immediate and appropriate corrective action to stop the harassment. *See, e.g.*, 29 C.F.R. § 1604.11(e); *Howard v. Winter*, 446 F.3d 559, 567 (4th Cir.2006).

The defendant in a single paragraph states that it "reprimanded [the plaintiff's] co-worker and required him to apologize, held additional training meetings with all members of the plaintiff's department regarding the company's harassment policy, and transferred the plaintiff to a higher-paying first shift position." (Mem. Supp. Summ. J. at 9; Def. Ex. B, D.) There are a number of issues with the defendant's evidence. First, it is not clear what "co-worker" the defendant is referencing. The plaintiff has not alleged that any "co-worker" harassed him such that any apology was owed; he has alleged that two Greenville Hospital employees harassed him. Second, the Court is unsure how additional training meetings with the *defendant's* employees might have cured unwanted harassment by employees of the Greenville Hospital. And, while it is true that the defendant eventually gave the plaintiff an undated memorandum offering a change in position, the defendant has offered no evidence as to how much time elapsed between the time when the plaintiff first gave notice of the harassment and when the offer of transfer was made. The plaintiff has put forward evidence that he first complained to his supervisor in December 2006, over a year before the transfer memorandum was apparently delivered. (Compare Pl. Dep. at 45–46 with Pl. Ex. D.)

Finally, the plaintiff has put forward evidence that the transfer was actually to his detriment. Specifically, there is evidence that the transfer would have resulted in a per hour decrease in his wages and an increase in the number of hours he was required to work. (Pl. Dep. at 69–70; Def. Ex. D, G.) The plaintiff has also testified that Cromer gave him an ultimatum, telling him "[e]ither you take [the transfer] or you're done." (Pl. Dep. at 71–72, 76.) The plaintiff told C.T. Cromer he could not take the shift; he has young children, one of whom had a medical condition, and he needed to be available to transport the child during the day. *Id.* at 67, 71–72, 76.

Accordingly, there exist serious questions about the responsiveness of the defendant's actions, even as it would characterize them.

Moreover, the plaintiff has put forward evidence that the defendant's true responses included the following: laughing at the plaintiff (Pl. Dep. at 58); telling the plaintiff that the complained of conduct was "just a joke" and that the plaintiff should "let it go" (Pl. Dep. at 46); stating that the complained of conduct was just a joke and not to take things serious (Pl. Dep. at 46–47); telling the plaintiff that "faggots" were "ignorant, retarded people," and that the manager knew the plaintiff was not retarded, *id.*; stating, "Do you realize this could cost me everything?" (Pl. Dep. at 49); telling the plaintiff, "I'm not responsible for the hospital. I'm only responsible for Cromer Food Service. If you have a problem with a Cromer Food Service employee, I can deal with it. But if you've got a problem at the hospital, then you've got to deal with the hospital, because I'm not responsible for that," (Pl. Dep. at 54, 112–113).

A reasonable jury could conclude from the plaintiff's evidence that, not only was the defendant unresponsive to the plaintiff's complaints of harassment, but it was affirmatively dismissive of the same.

Issues of fact, therefore, remain as to each element of the plaintiff's hostile work environment claim.

## II. Retaliation

Next, the plaintiff contends that he was retaliated against for having complained of the alleged sexual harassment and/or for having filed a charge of discrimination with the EEOC. Title VII makes it an "unlawful employment practice for an employer to discriminate against any of [its] employees ... because he [or she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). The *McDonnell Douglas* burden shifting scheme, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies in analyzing retaliation claims under Title VII. *Smith v. First Union Nat'l Bank*, 202 F.3d 234 (4th Cir.2000). The plaintiff does not attempt to use direct evidence to establish his claim of retaliation.

### A. *Prima Face* Case

In order to establish a *prima facie* case of Title VII retaliation, the plaintiff must prove three elements: (1) that he engaged in a protected activity, (2) that an adverse employment action was taken against him, and (3) that there was a causal link between the protected activity and the adverse employment action. *See EEOC v. Navy Federal Credit Union*, 424 F.3d 397, 406 (4th Cir.2005); *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir.2004).

The defendant contends that the plaintiff cannot establish either the second or third elements of his *prima facie* case. Specifically, the defendant contends that no adverse employment action was ever taken against the plaintiff. The plaintiff responds, however, that the offer of transfer was just such an action.

In *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the United States Supreme Court articulated an objective test for what constitutes an adverse employment action for purposes of a Title VII retaliation claim. Specifically, the Supreme Court stated that an adverse employment action is any action which might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (citation omitted). The retaliation provision of Title VII is intended to prohibit employer actions "that are likely to deter victims of discrimination from complaining to the EEOC, the courts,

and their employers." *Id.* Although normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence, *id.*, an employer's actions are to be considered in light of the "circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances," *id.* at 2417. The plaintiff has likely created a genuine issue of fact as to whether the offer of transfer was actually an adverse employment action.

As discussed above, there is evidence that the transfer was actually to the plaintiff's detriment in a number of respects, (Pl. Dep. at 69–70; Def. Ex. D, G.), and that Cromer threatened the plaintiff with termination if it were refused (Pl. Dep. at 71–72, 76). Critically, *Burlington* instructs the Court to objectively consider the affect of the action on a reasonable person *in the plaintiff's position. See Burlington,* 126 S.Ct. at 2417. Considering the alleged pay decrease and the plaintiff's particular childcare responsibilities, it seems that a jury could find that a reasonable person in the plaintiff's position would have perceived a threatened transfer to a day shift adverse.

Next, the defendant contends that even if the transfer constitutes an adverse action, there exists no causal link between the plaintiff's complaints and the offer of transfer. The Fourth Circuit has held, however, that "very little evidence of a causal connection is required to establish a prima facie case" and "merely the closeness in time between the filing of a discrimination charge and an employer's firing an employee is sufficient" to satisfy the causation element of a *prima facie* retaliation case. *Tinsley v. First Union Nat. Bank,* 155 F.3d 435, 443 (4th Cir.1998); *see also Williams v. Cerberonics, Inc.,* 871 F.2d 452 (4th Cir.1989) (holding three month time period between protected ac-

tivity and termination sufficient to satisfy the causation element of the prima facie case of retaliation); *Carter v. Ball,* 33 F.3d 450 (4th Cir.1994) (finding causal link between filing of retaliation complaints and the plaintiff's demotion five months later).

In this case, the evidence reveals that Cromer received a copy of the plaintiff's EEOC Charge and the Notice of Charge no more than *one week* prior to the offer of transfer, on March 22, 2009. (Cromer Dep. at 148–49, 164–65). Around that same time, Cromer told the plaintiff that he had received the Charge and asked the plaintiff, "What is your complaint, what is your grievance, what did I do that you are not happy with?" *Id.* at 164. The plaintiff also alleges that Cromer told him that he "got this stupid letter" from the EEOC. (Pl. Dep. at 60). When the plaintiff inquired about some other shift, in response to the offer of transfer, Cromer allegedly said, "This is all there is. Take it or leave it." *Id.* at 76.

Alone, the week's time between the defendant's receipt of the charge of discrimination and the arguable adverse employment action of the offer of transfer is more than sufficient evidence from which a jury could find a causal connection at the *prima facie* stage. A jury would be justified in additionally relying on Cromer's remarks, in so concluding.

The defendant has not addressed the remaining portions of the *McDonnell Douglas* burden shifting scheme, including its legitimate, non-retaliatory reasons for the transfer or the plaintiff's evidence of pretext. It has made only a passing statement that the offer of transfer was to ameliorate the plaintiff's concerns and not for any retaliatory reason. The Court believes that a jury would be justified in finding this claim pretextual based upon Cromer's arguably disparaging remarks concerning the Charge of Discrimination

and the fact that the transfer was offered essentially as an ultimatum. It seems that a jury could conclude that it was not a good faith attempt to cure the harassment insofar as it was such an inflexible solution.

Accordingly, genuine issues of fact remain as to the plaintiff's retaliation claim such that dismissal is improvident.

### III. Employment Relationship

The defendant also contends that the plaintiff's claims should be dismissed because he made material misrepresentations on his employment action, which, had they been known, would have vitiated the employment relationship between the defendant and the plaintiff. The defendant relies on two state law workers' compensation cases which are plainly inapposite. *See Cooper v. McDevitt & St. Co.*, 260 S.C. 463, 196 S.E.2d 833, 835 (1973); [Doc. 47–13 (*Brayboy v. WorkForce and American Home Assurance*, 383 S.C. 463, 681 S.E.2d 567 (2009))]. The defendant was not aware of any such misrepresentations at the time of the plaintiff's complaints and the offer of transfer. There is no dispute that the plaintiff, in fact, was employed by the defendant at all relevant times. Critically, actionable misconduct by the plaintiff does not act as a complete bar to his claims or otherwise render any provable discrimination "irrelevant." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 356–57, 115 S.Ct. 879, 130 L.Ed.2d 852 (U.S.1995.) As the defendant concedes, evidence of such misrepresentations may have some effect on allowable damages but it does not demand dismissal of the claims as a matter of law.

### CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that the defendant's motion for summary judgment [Doc. 47] be denied.

IT IS SO RECOMMENDED.

January 6, 2010.

Greenville, South Carolina.