**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 5 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

CYNTHIA TURNBULL,

       Plaintiff-Appellant,

v.

TOPEKA STATE HOSPITAL and
THE STATE OF KANSAS,

       Defendants-Appellees.

No. 00-3086

---

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 98-CV-2222-GTV)

---

Paul F. Pautler, Jr., of Blackwell Sanders Peper Martin LLP, Kansas City,
Missouri, for Plaintiff-Appellant.

Deborah June Purce, Topeka, Kansas (Alan D. Hughes, Legal Division,
Department of Social and Rehabilitation Services, Topeka, Kansas, with her on
the brief), for Defendants-Appellees.

---

Before **TACHA,** Chief Judge, **SEYMOUR** and **BRORBY,** Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Plaintiff/Appellant Cynthia Turnbull, a psychologist at the Topeka State Hospital (TSH) in Kansas, sued her employer and the state for sexual harassment after she was sexually assaulted by a patient. The jury found a sexually hostile work environment existed at TSH, but it split over whether TSH should be held legally responsible for that environment. After learning of the jury's inability to decide, the district court granted an earlier defense motion for judgment as a matter of law. The sole issue on appeal is whether that ruling was proper. We hold that it was not, and remand the case for further proceedings.

# I

We review de novo a grant of judgment as a matter of law. *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001). Rule 50 of the Federal Rules of Civil Procedure authorizes a trial judge to grant judgment as a matter of law "if, after a party has been fully heard on an issue, there is no legally sufficient evidentiary basis for a reasonable jury to find for the party . . . ." *Id*. Because a court does not lightly presume the decision of a reasonable juror, judgment "may be granted only if the evidence points but one way and is susceptible to no reasonable inference which may support the opposing party's position." *Id*. (internal quotations omitted). Thus, when a defendant seeks judgment as a matter

of law, the controlling question is whether the plaintiff has arguably proven a legally sufficient claim.

In making that determination, "[w]e do not weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for that of the jury." *Pizza Hut v. Lockard*, 162 F.3d 1062, 1068 (10th Cir. 1998) (quotations and citations omitted). Instead, we view "the facts and all reasonable inferences from them . . . in the light most favorable to the appellant." *Phillips*, 244 F.3d at 796. Accordingly, although the parties set forth varying versions of the underlying facts, we consider those facts in the light most favorable to Dr. Turnbull.

## II

Topeka State Hospital was a state-run inpatient mental health center[1] which treated patients with severe mental illnesses for whom outpatient treatment options had failed. TSH was not a jail. Patients were treated in the least restrictive environment possible, although all patients had been admitted because they posed some danger to themselves or others. While the hospital had an obligation to admit anyone referred there, unusually violent offenders could be transferred to more secure facilities.

---

[1] The hospital closed in 1997.

Cynthia Turnbull, a Ph.D. psychologist, came to TSH in 1993. She was hired to start a group therapy program for the adolescent treatment unit and to conduct individual and group therapy with adolescent male inpatients. One treatment issue that arose regularly was the "sexual acting out" displayed by many of the patients. TSH staff were aware this posed potential dangers, dangers that were tragically highlighted when a female employee was murdered by a patient in 1992. Dr. Turnbull recognized the risks of her job, and the hospital required that she regularly review and sign a job description that included mention of the risk of assault by patients. The hospital's general approach toward sexual acting out by patients, however, was that it was a clinical issue to be addressed in the patient's treatment program. The sexual harassment training that was required for each new staff member made no mention of how to respond to sexual harassment by patients.

Chronic understaffing at the hospital meant female staff often felt unsafe. While the hospital had several policies directed at the safety of staff members, Dr. Turnbull and others complained these measures were not always effective. For example, TSH staff received training in managing assertive or unruly patients, but the training focused on appropriate ways to calm the patient rather than self-defense to protect the staff member. Although psychologists could request extra staff to attend a group therapy session or other treatment, the shortage of staff

meant those requests were rarely met. The hospital purchased personal alarms known as "screechers" after the 1992 murder, but they had fallen out of use by the time Dr. Turnbull started work and she was never told of their availability. Dr. Turnbull testified about her safety concerns before an Executive Committee meeting in 1995, but she alleges the meeting minutes were later "sanitized" to remove all mention of her concerns. The Executive Committee did note in 1996 that another group of staff was expressing a "reality based fear" of conditions on the ward.

Other than her testimony to the Executive Committee, Dr. Turnbull made no formal reports of her safety concerns. She describes several conversations about safety with her supervisors in the psychology department. Both warned her not to send memoranda or file incident reports because her career would be hurt if the administration began to view her as a troublemaker.

The safety concerns were exacerbated for the psychologists because of a lack of adequate treatment facilities on the adolescent unit. There were no treatment rooms within that unit, and the one treatment room with a one-way mirror for visual monitoring was on an isolated floor in a separate building. During renovations on the adolescent unit, Dr. Turnbull requested that the hospital construct a treatment room with a large window in order to provide a safe place to conduct therapy, but no such room was provided. Dr. Turnbull met with

female patients and smaller male patients in her office, but she was uncomfortable meeting with larger males in the small, enclosed space. The only other options within the unit were public spaces that provided little protection for confidential conversation, and tiny seclusion rooms whose only furniture was a mattress on the floor. In pleasant weather, Dr. Turnbull and the other psychologists frequently solved the space dilemma by walking with patients around the hospital grounds as they spoke.

A patient named James Stout came into this environment in June 1996. Mr. Stout had sexually assaulted two female staff members at another state hospital prior to his transfer, but that fact was not communicated to TSH. His diagnosis on admission was "oppositional defiant disorder," a relatively mild diagnosis for a psychiatric inpatient but one characterized by a tendency toward aggression and difficulty submitting to authority. Dr. Turnbull performed his intake evaluation and noted he had trouble respecting personal boundaries when agitated. Although she did not believe his reports of past rapes and of voices telling him to "kiss" and "feel" somebody, she noted in his file that staff should not meet him alone in small, enclosed areas.

Despite these early warnings and one period when Mr. Stout was restrained for aggression, his therapy proceeded well, and by August he was allowed the privilege of field trips off the hospital grounds. He had several therapy sessions

with Dr. Turnbull and was never sexually inappropriate toward her. On August 26, the weather was fine and many people were outside enjoying the day, so they headed outside to walk the grounds during their therapy session. When they reached a slightly secluded area, he suddenly attacked. He knocked her to the ground, undressed her and digitally penetrated her, bit and choked her, and repeatedly threatened to kill her. Dr. Turnbull suffered post-traumatic stress disorder after the assault and never returned to the hospital.

In addition to filing criminal charges against James Stout, Dr. Turnbull sued TSH and the State of Kansas under Title VII for allowing a sexually hostile work environment to exist at the hospital. At trial, the jury heard almost seven days of evidence. TSH made a Rule 50 motion for judgment as a matter of law at the close of plaintiff's evidence and again at the close of its own, arguing Dr. Turnbull had not proven a legally sufficient hostile work environment claim. The court took each motion under advisement, and the jury began its deliberations.

The jury was asked to determine two issues: whether a sexually hostile work environment existed at TSH and, if so, whether the hospital or state should be held legally responsible. After two half-days of deliberation, the jury reported it was unable to reach a unanimous decision on the second question and felt further deliberation would be fruitless. The court revisited defendants' Rule 50

motions at that time, holding without discussion that the evidence had not shown a cognizable claim of gender based sexual harassment and dismissing the case.

## III

"Sexual harassment is actionable under a hostile work environment theory when the harassing conduct is 'sufficiently severe or pervasive to alter the conditions [of the victim's] employment and create an abusive working environment.'" *Lockard*, 162 F.3d at 1071, quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). There is no "mathematically precise test" for determining whether the conduct is sufficiently severe or pervasive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). Some factors to be weighed include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 23. Because frequency is merely one factor in the analysis, an isolated incident may suffice if the conduct is severe and threatening. *See, e.g., Lockard*, 162 F.3d at 1072 (allowing claim based on single incident); *Smith v. NW Fin. Acceptance Corp.*, 129 F.3d 1408, 1413 (conduct must be "sufficiently pervasive *or* sufficiently severe"). The harassing conduct must be "both objectively and subjectively abusive." *Lockard*, 162 F.3d at 1071.

-8-

Here, the jury found Dr. Turnbull was subjected to a sexually hostile work environment. *See* R. at 1458. We easily conclude that determination was not unreasonable. While there was only one incident,[2] it was objectively abusive, dangerous, and humiliating, and Dr. Turnbull was so traumatized she was unable to return to work thereafter. TSH argues any dangers inherent in the hospital environment could not constitute sexual harassment because the male staff members were also subject to sexual comments or physical attack by patients. However, conduct that affects both sexes may constitute sexual harassment if it disproportionately affects female staff. *See Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111 (8th Cir. 1997) (assaults on female staff sexual harassment even

---

[2] Title VII provides that an employee must file a complaint with the Equal Employment Opportunity Commission within three hundred days of the acts about which she complains. *See* 42 U.S.C. § 2000e-5(e). Counting back three hundred days from the date Dr. Turnbull filed her complaint yields a date of July 19, 1996, approximately five weeks before her attack. Accordingly, TSH argues any events that took place before that date are time barred and must not be considered. In response, Dr. Turnbull argues the environment that existed throughout her employment constituted *continuing* sexual harassment and should be considered as a whole. *See Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1414-16 (10th Cir. 1993) (discussing continuing course of conduct for sexual harassment under Title VII).

It is undisputed that the attack itself took place within the statutory time period. Because the attack itself is sufficient to support a claim for sexual harassment and Dr. Turnbull does not specify other incidents as bases for her claim, we treat the attack as a single incident of harassment. However, we examine other events in the record to determine the general environment at the hospital, whether TSH was on notice of employee sexual harassment concerns, and whether the hospital took reasonable measures to ensure the safety of its employees.

though patient also assaulted male staff member).  The male staff of TSH were not subject to the fear or the reality of sexual assault in the same manner as the female staff.  We turn, therefore, to the more difficult question of whether TSH should be legally liable for the harassment.

We have held that an employer may be responsible for sexual harassment based upon the acts of nonemployees.  *Lockard*, 162 F.3d at 1073 (restaurant responsible for acts of customers); *see also Crist*, 122 F.3d at 1108 (group home liable for acts of mentally incapacitated resident); 29 C.F.R. § 1604.11(e) (employer may be responsible for acts of non-employee where employer "knows or should have known of the conduct and fails to take immediate and appropriate corrective action").  To protect against imposing strict liability upon employers, we apply a negligence analysis, asking whether the organization "fail[ed] to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *Lockard*, 162 F.3d at 1074, *citing Hirschfeld v New Mexico Corrections Dept.*, 916 F.2d 572, 577 (10th Cir. 1990); 29 C.F.R. § 1604.11(e) (employer liable if "fails to take immediate and appropriate corrective action").  The focus is not on the conduct itself but on the employer's behavior in response; a hospital cannot control every act of its patients, but it does control the environment at large. *Crist*, 122 F.3d at 1110-12.

The negligence analysis can be divided into two separate inquiries, looking "first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998). With regard to knowledge, a plaintiff may prove actual knowledge based on her reports of harassment to management-level employees or constructive knowledge based on the pervasiveness of the sexual hostility within the working environment. *Id.* While Dr. Turnbull made no complaints about James Stout in particular prior to the attack, she spoke about general safety concerns with her supervisors on multiple occasions, even bringing those concerns to the hospital's Executive Committee. Trial testimony established that the atmosphere of sexual hostility at the hospital was pervasive. Indeed, part of TSH's defense is that the dangers were so obvious that employees knowingly assumed those risks through their continued employment. A reasonable juror could conclude that TSH had either actual or constructive knowledge of the risk of sexual assault by patients.

The final question, whether TSH responded appropriately to the known dangers on the adolescent unit, is the real crux of this case. We have established no bright-line rule for measuring the "appropriateness" of an employer's response, asking instead whether the response was reasonable under the circumstances. *Id.* at 675-76. Key factors in that determination are the

promptness and effectiveness of any action. *Id*. at 676. It is not always possible for an employer to completely eliminate offensive behavior, and thus the effectiveness inquiry looks not to whether offensive behavior actually ceased but to whether the "remedial and preventative action was reasonably calculated to end the harassment." *Id*. We also consider "the appellants' expectations given their choice of employment." *Crist*, 122 F.3d at 1111. In an environment like TSH it would be impossible to eliminate all potential risk; instead, we ask whether the hospital took reasonable measures to alleviate known or obvious risks.

TSH contends that "[i]n an environment like TSH, where the patients were . . . a danger to themselves or others, employees like plaintiff inherently assume the risk of facing sexually hostile, aggressive patients." Aplee. Br. at 50. In support of this theory, it cites cases which held prisons were not liable for sexual harassment or sexual assaults by an inmate. *See, e.g., Powell v. Morris*, 37 F.Supp.2d 1011 (S.D. Ohio 1999); *Hicks v. Alabama*, 45 F.Supp.2d 921 (S.D. Ala. 1998). This argument overlooks the continued emphasis on the employer's preventive measures, however. As explained in one case, "Courts have repeatedly declined to impose sexual harassment liability upon correctional institutions for the sexually offensive conduct of inmates, *as long as the defendant institution took proper preventative and remedial steps* with regard to inmate behavior." *Powell*, 37 F.Supp.2d at 1017 (emphasis added); *see also Hicks*, 45 F.Supp.2d at

-12-

933 (prison not liable where plaintiffs could identify no extra measures that could have prevented incident).  Even in an inherently dangerous working environment, the focus remains on whether the employer took reasonable measures to make the workplace as safe as possible.

It is undisputed that TSH took some measures to ensure the safety of its staff.  Nevertheless, Dr. Turnbull contends the hospital could have, and should have, done much more.  More staff would have made the wards safer, as would treatment rooms in visible areas.  The hospital could have provided self-defense training and better informed staff how to respond if sexually harassed by a patient.  Although screechers were technically available, TSH could have ensured they were given to each staff member and kept in working order.  Because the jury was divided on the issue of TSH's liability, we can deduce that one or more jurors believed the hospital's preventative measures were inadequate.  We can not say that determination would be unreasonable as a matter of law on this record.  Applying all reasonable inferences in favor of Dr. Turnbull, we conclude she presented sufficient evidence to support a claim of sexually hostile work environment against TSH.  Accordingly, we hold that the grant of judgment for TSH as a matter of law was improper.

We **REVERSE** the district court's judgment in favor of TSH and **REMAND** for a new trial.