**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 18, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

DIANA AGUIAR,

        Plaintiff - Appellant,

v.

BARTLESVILLE CARE CENTER, a
domestic for profit business association,

        Defendant - Appellee.

No. 10-5002
(D.C. No. 4:08-CV-00178-GKF-PJC)
(N.D. Okla.)

---

**ORDER**
**GRANTING PANEL REHEARING**

---

Before **TACHA, LUCERO,** and **MURPHY,** Circuit Judges.

---

On January 28, 2011, the court issued its Order and Judgment in this appeal. The

appellee, Bartlesville Care Center, filed a petition seeking panel rehearing and rehearing

en banc. The court asked for a response from the appellant, Diana Aguiar, pursuant to

Fed. R. App. P. 40(a)(3). A response was filed.

The petition for rehearing en banc was transmitted to all of the judges of the court

who are in regular active service. As no member of the panel and no judge in regular

active service on the court requested that the court be polled, that part of the petition for

rehearing is denied pursuant to Fed. R. App. P. 35.

However, the panel grants rehearing pursuant to Fed. R. App. P. 40. The previous

Order and Judgment, <u>Aguiar v. Bartlesville Care Center</u>, 2011 WL 263204, 111 Fair

Empl. Prac. Cas. (BNA) 653 (10th Cir. Jan. 28, 2011), is vacated and the attached Order

and Judgment is substituted in its place.

        Entered for the Court
        ELISABETH A. SHUMAKER
        Clerk of Court

        by:
        Douglas E. Cressler
        Chief Deputy Clerk

FILED
United States Court of Appeals
Tenth Circuit

April 18, 2011

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

DIANA AGUIAR,

        Plaintiff-Appellant,

v.

BARTLESVILLE CARE CENTER,
a domestic for profit business association,

        Defendant-Appellee.

No. 10-5002
(D.C. No. 4:08-CV-00178-GKF-PJC)
(N.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **LUCERO**, **TACHA**, and **MURPHY**, Circuit Judges.

---

Plaintiff Diana Aguiar worked as a certified medication aid (CMA) at the

defendant Bartlesville Care Center (the Center). During the course of her employment,

she claims that she was sexually harassed by a resident. Following her termination for

verbally abusing the resident, she filed suit under Title VII for hostile work environment

sexual harassment and retaliation. Ms. Aguiar appeals from the district court's order

granting the Center's motion for summary judgment. We have jurisdiction under 28

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

U.S.C. § 1291, and affirm the order on the retaliation claim and reverse the order on the hostile work environment claim.

                                        I.

Ms. Aguiar first worked at the Center as a certified nurse assistant (CNA) from 2002 to 2005. She returned to the Center in July 2006, and became a CMA in 2007, which was her job when she was fired on May 14, 2007. Her job as a CMA was to distribute medication to residents, including the resident she claims sexually harassed her. Ms. Aguiar contends that the resident's incessant groping and verbal abuse created a hostile work environment. She further argues that she was fired in retaliation for complaining about the harassment.

The resident, who had a prosthetic leg, diabetes, and diabetic retinopathy, was admitted to the Center in late August 2006. Despite these physical impairments, he was able to ambulate throughout the facility. When the resident arrived at the Center, he was involved in criminal proceedings concerning domestic abuse, assault and battery, and violation of a protective order. The record reflects that staff transported the resident to and from the courthouse to attend various proceedings. Alex Dout, the Center's administrator, says he was aware of the resident's criminal entanglements prior to firing Ms. Aguiar, however, he could not remember when, from whom, or the circumstances under which he learned the information. For her part, Ms. Aguiar testified that it wasn't until after she was fired that she learned the resident "was sentenced or something like that to [the Center] for assault and battery on his wife." Aplt. App. at 70.

Initially, Ms. Aguiar and the resident formed a friendship, but things changed on January 12, 2007, when a care giver who had been working with the resident quit.[1] Ms. Aguiar contends this was when the harassment began. There are several documents generated in January 2007, which shed light on what the Center knew about the resident's behavior and its response. On January 11 (the day before the care giver quit), a nurse noted that the resident was "requesting to see a CNA, sent one down to him but he was requesting a certain CNA by name. [A]dvised him that she was busy at the time and [he] became very agitated and wanted that aid now." *Id*. at 169. About an hour later, the same nurse reported that "when [a] certain CNA did not go to his room he became very upset, acted depressed and refused his meds." *Id*. The next day, January 12, a different nurse wrote that the resident was "very upset." *Id*. He "ask[ed] why certain CNAs (named) do not come to [his] room." *Id*. She "advised [him] that CNA on duty will assist [with] his needs, asking for [a] certain CNA is inappropriate. [A]dvised that this nurse has witnessed him be inappropriate [with] CNAs [at] times[,] therefore asking for specific person when [zero] care is needed cannot be an option." *Id*.

---

[1] At her deposition, Ms. Aguiar testified that the care giver quit because of the resident's "[s]exual harassment." Aplt. App. at 50. "He would touch on her, kiss on her, and she was not comfortable with it." *Id*. Ms. Aguiar further testified that the care giver complained to Alex Dout, the administrator. However, Ms. Aguiar's testimony on this topic is inadmissible hearsay and cannot be used on summary judgment. *See Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (quotation omitted) (stating that "[h]earsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill").

The next document titled "RESIDENT STATUS SHEET," noted that when caring for the resident there should be "2 CNA staff in room at all times." *Id*. at 165. It explained that the resident was "[i]nappropriate [at] times [with] staff. X2 staff when doing cares; assisting [with] cares etc." *Id*. A "Care Plan," *id*. at 168, listed as a goal helping the resident "[d]emonstrate[] socially acceptable behaviors." *Id*. To meet this goal, the plan included the following approaches: "Discourage resident from requesting only one CNA to care for him . . . [and] must always have 2 staff in room to care for resident." *Id*.

The record also reveals that by the end of February 2007, Ms. Aguiar had complained several times about the resident's conduct to the Center's director of nursing, Suzanne Stahl, and its director of social services, David Yountz. On February 22, the resident asked to speak with Ms. Stahl about "'problems' he was having with Aguiar." *Id*. at 142. The resident said the "problem" was Ms. Aguiar's efforts to avoid him. Ms. Stahl "[f]rankly explained to [the resident] that [Aguiar] is not comfortable [with] his affections. And has [complained of] this to this nurse several times. (Also David [Yountz] [with] SS has talked to [resident] about this)." *Id*. at 176. The resident suggested to Ms. Stahl that "if Diane has a problem [with me] she needs to talk to [me] about it." *Id*. Ms. Stahl "[a]ssured [resident] that Diane, myself [and] SS Director will get together soon [and] resolve this issue." *Id*.

The next morning, February 23, 2007, the resident again summoned Ms. Stahl to his room. This time, the resident's complaint was "that the 'situation' ([with] CMA)

-4-

[was] getting worse. [He] state[d] 'I've been accused of rape.'" *Id*. at 177. When asked if Ms. Aguiar had said this directly to him, he stated "'no,' it's what I've heard. You know how word spreads." *Id*. at 177-78. The notes state that Ms. Stahl promised the resident that she, Mr. Yountz, and Ms. Aguiar would meet with him later in the afternoon. At that meeting, "[a]ll complain[t]s were aired [and the resident] agree[d] to stop touching [and] kissing Diane's hand [and] Diane will make sure he receives professional cares only (from her) if he continues to act appropriately." *Id*. at 178. "SS Director [and Ms. Stahl] reiterated to [resident] that this behavior (touching staff) stops [with] all staff members." *Id*.

The following Monday, February 26, 2007, Ms. Aguiar went to see Ms. Stahl. She told her that the resident accused her of "defamation," *id*. at 179, and criticized her for complaining that he was "too . . . touchy," *id*. "[Diane] very upset [because] trying to do her job professionally." *Id*. Ms. Stahl, accompanied by Ms. Aguiar, went to the resident's room, where Ms. Stahl told him to "stop bringing up the past," *id*., and "[r]einforced that [there should be] no inappropriate language or touching," *id*.

Despite these admonitions, Ms. Aguiar contends the resident continued his harassment, which included kissing her hand, running his hand down her back to her buttocks, and pulling her on his lap or on the bed, even when a second care giver was present. The deposition testimony of a former co-worker confirms that while she was serving as the second care giver along with Ms. Aguiar, the resident "pull[ed] [Ms. Aguiar] down into [a] recliner and [held] her down there, pinning her on top of him,

holding her, not letting her get up." *Id.* at 297-98. This particular co-worker also testified that Ms. Aguiar complained to Mr. Yountz, and that both Ms. Stahl and the assistant director of nursing, Christine Blizzard, knew about the harassment. She testified that "everybody, from all departments to residents amongst themselves[,] I mean everybody," *id.* at 301, knew and talked about the situation between Ms. Aguiar and the resident.

Ms. Aguiar says that she continued to complain, but all the Center did was "talk[] to him," *id.* at 69, log documentation, and have someone else deliver his medications, which made the situation worse, because he would seek her out. Although she could not identify specific dates, Ms. Aguiar testified at her deposition that "[i]f I was there, something happened." *Id.* at 56. Another co-worker's affidavit confirms that the resident "routinely and consistently subjected Diana Aguiar to unwanted touching on numerous occasions," *id.* at 322, and that the "administrators of [the Center] knew that [the resident] has a history of physical abuse towards others and that he was consistently seeking out Diana Aguiar and physically/sexually assaulting her," *id.* at 323.

The Center argues that it adequately responded to Ms. Aguiar's complaints by talking to the resident and making sure that there were always two people present when caring for him. And according to its staff coordinator, Chris Blizzard, in early 2007, he "suggested . . . that [Ms. Aguiar] move from working on the west side of the building to working on the east side of the building. . . . Aguiar refused. . . . I assumed that any problems she was having with [the] Resident were not serious." *Id.* at 157. In contrast, Ms. Aguiar's affidavit states that "[w]hen I complained, I was never given an option to

move to another hall in the facility. Even if it was suggested, and I do not recall this suggestion, there were no attempts made by management at BCC to change my hall or follow through with such a suggestion." *Id*. at 305.

Matters came to a head on May 13, 2007. Michael Sinks, Ms. Aguiar's supervisor that day, wrote about an incident in the dining room where the resident began complaining in a loud voice about Ms. Aguiar "and past events from 2/23/07." *Id*. at 186. When a nurse tried to calm him, the resident told his fellow diners: "'They are going to fucking stop the shit.'" *Id*. at 187. The resident confronted Mr. Sinks when he came to his room to test his blood sugar, demanding to know why Ms. Aguiar had not given him his medications. According to Mr. Sinks's notes, just a few minutes later, the resident "walked [by the] nurse[']s desk, went up north hall & headed straight to CMA 'Diane.' Res[ident] stated 'Can't you do your job.' CMA stated 'yes I can, but when you interfere [with] me doing my job [and] bad mouth me it goes to the nurse, [and] if you have anything else to say talk to the nurse.'" *Id*. at 187-88. The resident called Ms. Aguiar a "'bitch' then . . . shove[d] [the] med[icine] cart [into her]." *Id*. at 188. He then came at her, and "moved his left hand suddenly causing [her] to jerk." *Id*. Then, as if "nothing ever happened," *id*., the "res[ident] slid [his] hand on [the] side of his head [and] smiled," *id*. Mr. Sinks called Christine Blizzard, the assistant director of nursing, at home.[2] Ms.

---

[2]    According to Ms. Aguiar, Michael Sinks called Christine Blizzard at home as many as two times prior during the weekend to report the escalating situation that culminated in the hallway assault.

Blizzard told him to send Ms. Aguiar home and the resident for an outside psychiatric evaluation.

The following day when Ms. Aguiar came to work, she was told to go to Mr. Dout's office. With both Ms. Stahl and Ms. Blizzard present, he asked if she called the resident a "prick." When she admitted doing so, he fired her. According to Ms. Aguiar, neither Ms. Stahl nor Ms. Blizzard said anything about what happened the previous day or explained the history of her complaints about the resident. Mr. Dout says when he made the decision to fire Ms. Aguiar, he knew nothing about the situation between her and the resident, including her history of complaints.

The district court heard oral argument on the Center's motion for summary judgment and issued an oral ruling. With regard to the hostile work environment claim, the court assumed that Ms. Aguiar was sexually harassed, but concluded that summary judgment was proper for two reasons. First, it found that the Center "adequately responded to the sexually harassing conduct of which it was aware," *id.* at 392, noting that "[t]he resident's care plan was modified by . . . requiring two staff members to be present in the resident's room when care was being administered," *id.*, and Ms. Aguiar had the option of asking another CMA to take medications to the resident. Second, it found that Ms. Aguiar "failed to come forward with facts sufficient to show that the [Center] had knowledge of the more egregious harassment than hand kissing, et cetera, which gave rise to the modified care plan." *Id.*

As to the retaliation claim, the district court found that the Center had a "legitimate non-discriminatory reason [for firing Ms. Aguiar]" and that Ms. Aguiar failed "to show that the reason given is a pretext for retaliation here." *Id*. at 391. "The Center's "[h]andbook here warned that verbal abuse of residents . . . will result in immediate discharge." *Id*. Alternatively, the court found that Ms. Aguiar failed in her burden of demonstrating a prima facie case because she "has not sufficiently established a causal connection between the adverse employment action and the protected activity as there is insufficient evidence that Mr. Dout was aware of Ms. Aguiar's complaints at the time he terminated [her]." *Id*. at 391-92.[3]

## II.

"We review the district court's grant of summary judgment de novo." *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1152 (10th Cir. 2006). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c)(2). "An issue is 'genuine' if there is

---

[3]   Ms. Aguiar also pleaded a state law claim for negligent supervision on the theory that the Center failed to protect her from the assault and battery that took place on May 13, 2007. Eventually, the resident was charged with and pleaded guilty to assault and battery arising from the incident. The district court granted summary judgment to the Center on the negligent supervision claim "for the same reasons that her Title VII claims [for retaliation and hostile work environment] fail," Aplt. App. at 393, and entered judgment in favor of the Center. As an alternative holding, the court held that even if summary judgment was improper, it declined to exercise pendent jurisdiction over the claim, and dismissed it "without prejudice." *Id*. Based on our holding that the court erred in granting summary judgment on Ms. Aguiar's hostile work environment claim, we remand for the court to reconsider its rulings with respect to the state law claim.

sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Id*. "We must view the evidence and all inferences that might be reasonably drawn from it in the light most favorable to [the non-moving party]." *Escue*, 450 F.3d at 1152.

III.

"Sexual harassment is actionable under a hostile work environment theory when the harassing conduct is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Lockhard v. Pizza Hut, Inc*., 162 F.3d 1062, 1071 (10th Cir. 1998) (quotation and brackets omitted). This is true regardless of whether the environment is created by a fellow employee or nonemployee, such as a customer, because "the employer ultimately controls the conditions of the work environment." *Id*. at 1074.

The Center argues that a rational trier of fact could not find the existence of a hostile work environment. We disagree. Ms. Aguiar presented evidence that the resident "routinely and consistently subjected [her] to unwanted touching[,]" Aplt. App. at 322, interfered with her work, and eventually assaulted her, which is sufficient to create a genuine dispute as to this material fact. *See Lockhard*, 162 F.3d at 1072 (discussing the relevant factors in determining an actionable hostile work environment, including the frequency, severity, and physical nature of the conduct).

-10-

We also disagree with the Center's argument that the result in this case is in conflict with *Cain v. Blackwell*, 246 F.3d 758 (5th Cir. 2001). In *Cain*, the court affirmed the district court's grant of summary judgment on the ground that there was no sexual harassment. The court reiterated the familiar standard to determine whether there is a hostile work environment, including "the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 760 (quotation omitted). What is different about *Cain* and Ms. Aguiar's suit are the facts, not the law. Ms. Cain worked as a home health provider for a client described as "an elderly man suffering from Alzheimer's and Parkinson diseases, who often was disoriented and irritable and who had been declared incompetent by a Texas state court." *Id*. at 759. Ms. Cain agreed to work with the client "with full knowledge of the relevant facts." *Id*. According to Ms. Cain, the client "repeatedly propositioned her for sex, and repeatedly called her disparaging names[.]" *Id*. The court concluded that "[w]hile clearly crude, humiliating, and insensitive, *the unique circumstances in this case* makes the elderly and obviously impaired [client's] commentary insufficient to establish sexual harassment." *Id*. at 760 (emphasis added). The unique circumstances in *Cain* are not present in this case, where the resident was not similarly impaired and his conduct was more egregious.

In cases where a plaintiff claims harassment by a nonemployee, we apply a negligence theory. *Id*. at 1074. "The negligence analysis can be divided into two

-11-

separate inquiries, looking first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses." *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244 (10th Cir. 2001) (quotation omitted).

"With regard to knowledge, a plaintiff may prove actual knowledge based on her reports of harassment to management-level employees or constructive knowledge based on the pervasiveness of the sexual hostility within the working environment." *Id.* Although the Center says that it never heard any further complaints from Ms. Aguiar after late February 2007, Ms. Aguiar contends that she continued to complain to her supervisors about the resident's behavior. Thus, there are genuine issues of material fact in dispute concerning whether or not the Center had actual knowledge of the harassment. Alternatively, the deposition testimony of a former co-worker that "everybody, from all departments to residents," Aplt. App. at 301, talked about the situation, is sufficient to create a genuine issue regarding whether the Center had constructive knowledge of the harassment.

There is "no bright-line rule for measuring the [adequacy] of an employer's response." *Turnbull*, 255 F.3d at 1244-45. Instead, we look at "whether the response was reasonable under the circumstances." *Id.* at 1245. "Key factors in that determination are the promptness and effectiveness of any action." *Id.* Because "[i]t is not always possible for an employer to completely eliminate offensive behavior, . . . the effectiveness inquiry looks not to whether offensive behavior actually ceased but to whether the remedial and

-12-

preventative action was reasonably calculated to end the harassment." *Id*. (quotation omitted).

It is undisputed that in January and February 2007, the Center took some steps to end the harassment when it talked to the resident and ordered that two care givers be present when attending to him. Nonetheless, Ms. Aguiar contends that the Center could have and should have done more once it learned that these steps were ineffective. For its part, the Center says that it offered Ms. Aguiar the opportunity to move to the other side of the building and away from the resident. But Ms. Aguiar denies that any such offer was made, and that is how matters stand on summary judgment. Viewing the evidence in the light most favorable to Ms. Aguiar, we conclude that a rational trier of fact could find that the Center's response was inadequate. Because there are genuine issues of material fact concerning the Center's knowledge and the adequacy of its response, summary judgment was improperly granted on Ms. Aguiar's hostile work environment claim.

IV.

In cases where a Title VII plaintiff relies on indirect or circumstantial evidence to prove retaliation, we examine the claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff carries the initial burden of establishing a prima facie case, which requires her to "demonstrate (1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse

action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (footnote omitted).[4] Once a plaintiff meets her initial burden, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action. If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate the proffered explanation is pretext. *See id.* at 1202-03.

It is undisputed that the Center articulated a legitimate, non-discriminatory reason for firing Ms. Aguiar – she verbally abused the resident in violation of written policy. It then fell to Ms. Aguiar to prove pretext. "To show that the defendant's proffered . . . reasons were actually a pretext . . .[,] the plaintiff must demonstrate that the defendant's . . . proffered reasons were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (quotation omitted).

Ms. Aguiar cannot prove pretext. The decision to fire her was made by Mr. Dout. There is no evidence that he had any knowledge about her prior complaints concerning the resident's sexual harassment. According to Ms. Aguiar, when she met with Mr. Dout, he asked her if she "really called [the resident] a prick?" Aplt. App. at 65. She admitted

---

[4] We acknowledge that because Ms. Aguiar's termination was "very closely connected in time," *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006) (quotation omitted), to a protected activity – her complaints during the weekend of May 13, 2007, and her termination the following day – she arguably established a causal connection for purposes of the prima facie case. However, we need not address causation, because there is inadequate evidence to prove pretext, for which temporal proximity between protected activity and the alleged retaliation is not by itself sufficient to undermine the stated reason for termination. *Id.*

-14-

doing so, and "tried to explain it. It didn't matter. I wrote [what happened on May 13] down on the statement." *Id.* Because there is no evidence that Mr. Dout knew about her previous complaints, Ms. Aguiar cannot establish that he had any motivation other than enforcement of the rule as grounds for termination. Therefore, the district court correctly concluded that summary judgment was proper on the retaliation claim.[5]

We AFFIRM the district court's grant of summary judgment on the retaliation claim. We REVERSE the grant of summary judgment on the hostile work environment and negligent supervision claims and remand for further proceedings.

Entered for the Court


Michael R. Murphy
Circuit Judge

---

[5] Ms. Aguiar argues that "even if Dout was unaware of [her] complaints, there is an issue of fact regarding whether Stahl and Blizzard retaliated against [her] since they knew of her complaints when she was fired and failed to inform Dout themselves." Aplt. Opening Br. at 22. But Ms. Aguiar never develops this argument with any legal authority, and we decline to address it. *See United States v. Banks*, 451 F.3d 721, 728 (10th Cir. 2006) (refusing to address an argument that is not supported by any legal authority).