**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 23, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

PAUL P. NELSON,

    Plaintiff - Appellant,

v.

LOUIS DEJOY, Postmaster, United States
Postal Service,

    Defendant - Appellee.

No. 23-1227
(D.C. No. 1:21-CV-01011-RBJ)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, **MATHESON**, and **McHUGH**, Circuit Judges.
_____

Plaintiff Paul Nelson, a United States Postal Service ("USPS") employee, filed

suit under Title VII of the Civil Rights Act of 1964 alleging claims for race

discrimination and hostile work environment ("HWE").  The district court dismissed

the action without prejudice, holding that Mr. Nelson failed to state a valid claim for

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

relief under Title VII.  Mr. Nelson now appeals.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A. *Factual History*

Mr. Nelson sued Postmaster DeJoy in 2021 and amended his complaint four times.  His fourth amended complaint—the operative complaint— alleged the following facts.

Mr. Nelson, who is Black, suffers from post-traumatic stress disorder ("PTSD") as a result of his service in the United States Army.  In April 1994, he began working for USPS.  As of August 8, 2016, he worked as a letter carrier at USPS's North End Station ("Station") in Colorado Springs, Colorado.  Mr. Nelson was one of only three Black employees at the Station.

When Mr. Nelson arrived at the Station for duty at 7:32 a.m. on August 8, 2016, "a large Caucasian Manager," Richard Hendrix, "was conducting a stand-up meeting . . . with the carriers at the Station."  Aplt. App. at 8.  Mr. Nelson did not know Mr. Hendrix but later learned that Mr. Hendrix "was visiting the Station . . . as part of a Kaisen project and . . . was acting with managerial authority on behalf of . . . USPS."  *Id.*

Mr. Hendrix, in front of approximately 20 USPS employees, "began swearing at Mr. Nelson as soon as Mr. Nelson entered the Station floor," "addressed" Mr. Nelson "in a rude and offensive manner," and "act[ed] in a shockingly unprofessional manner."  *Id.* at 8–9.  He yelled at Mr. Nelson, "[Y]ou need to get the hell over

2

here!" *Id.* at 9 (quotations omitted). Mr. Nelson "asked Mr. Hendrix who he was and requested that he show the group some respect." *Id.* Mr. Hendrix "aggressively approached Mr. Nelson" and yelled, "I am talking! Shut your mouth when I am talking!" *Id.* (quotations omitted). Mr. Hendrix then "charged at Mr. Nelson and ordered him to get into the manager's office." *Id.* Mr. Nelson, "[f]earing for his safety, . . . declined to go into the manager's office without his union steward being present." *Id.* Mr. Hendrix went to "a nearby supervisor's desk," "picked up a phone," and "dialed 911." *Id.*

"As he was dialing 911, Mr. Hendrix smugly remarked to Mr. Nelson that he was 'going to laugh when they haul you out in cuffs.'" *Id.* at 9–10. Mr. Hendrix then "proceeded to make a series of false statements to the 911 dispatcher." *Id.* at 10. Specifically, he claimed that Mr. Nelson "had made verbal threats that were 'almost physical' in nature" and that Mr. Nelson was "cursing, being loud, not following instructions[,] and becoming threatening." *Id.* Mr. Hendrix told the dispatcher that the disruptive employee "'need[ed] an escort out of this building.'" *Id.* "Mr. Hendrix described the 'disruptive employee' . . . as 'a Black male about 5 foot 8'" and stated that the employee "might be 'high' or 'on drugs'" because "this was not 'normal behavior.'" *Id.*

When the 911 dispatcher asked if anyone was in immediate danger, Mr. Hendrix responded, "'[C]ould be, I don't know. He is out of hand.'" *Id.* The dispatcher then asked Mr. Hendrix "whether he and others at the scene were safe at that moment." *Id.* Mr. Hendrix "responded 'that's why I am calling you, I don't

3

believe we are.'" *Id.* The dispatcher asked Mr. Hendrix if "anyone needed medical attention" and Mr. Hendrix stated, "'[N]ot yet.'" *Id.* The dispatcher also asked Mr. Hendrix if he and other employees "could get themselves to a safe spot." *Id.* Mr. Hendrix "responded that they could go wait for the police in the break room, where they would be safe." *Id.*

Approximately 18 minutes after he first called 911, Mr. Hendrix placed a second call to 911 and "falsely report[ed] that the employee had 'calmed down quite a bit' in the wake of the first 911 call." *Id.* at 11. According to Mr. Nelson, he had "in fact . . . remained perfectly calm throughout that morning." *Id.*

Three officers from the Colorado Springs Police Department arrived at the Station and questioned Mr. Nelson. No arrests were made and no charges were filed. But Mr. Hendrix's "aggression, hostility and abuse," in combination with the arrival of the officers "triggered Mr. Nelson's PTSD" and caused him to "immediately beg[i]n suffering emotional distress." *Id.* Shortly after the police officers left the Station, Mr. Nelson called his doctor to schedule an appointment for the following day, and also "requested that he be allowed to take sick leave" for that doctor appointment. *Id.* at 13.

Mr. Hendrix "later made numerous sworn factual statements regarding" the incident "that were at odds with the carriers' accounts of events, as well as with statements that he made to the 911 dispatcher." *Id.* at 11. Those sworn factual statements, Mr. Nelson alleged, were contrary to the statements that Mr. Hendrix made to the 911 dispatcher.

4

Mr. Nelson alleged that Mr. Hendrix's actions towards him on the morning of August 8, 2016, "were driven by discriminatory animus based on race." *Id.* at 12. Mr. Nelson also alleged that "[o]ther postal carriers who witnessed" Mr. Hendrix's conduct concluded those "actions were motivated by racial animus." *Id.*

B. *Procedural History*

1. **Title VII Claims**

a. *Race discrimination*

Mr. Nelson asserted two claims under 42 U.S.C. § 2000e-16(a), Title VII's federal-sector provision. The first alleged that Postmaster DeJoy was "liable for the acts and/or omissions of its agents and employees, including Mr. Hendrix," and thereby discriminated against Mr. Nelson "because of his race." *Id.* at 13–14. He alleged that Mr. Hendrix's actions were "materially adverse" because they "carried a significant risk of humiliation" to Mr. Nelson "in front of his peers," which affected and damaged his reputation, and also caused "concomitant harm to" his "opportunities for future employment and advancement." *Id.* at 14. He also alleged that Postmaster DeJoy failed to protect Mr. Nelson "from discrimination and harassment at the hands of management," and thereby denied him "equal terms and conditions of employment and otherwise adversely affected his employment status because of his race." *Id.* Finally, Mr. Nelson alleged that he continues to suffer "emotional distress relating to the events of August 8, 2016." *Id.* at 15.

b. *Hostile work environment*

The second claim alleged race-based harassment and HWE. Mr. Nelson alleged that Mr. Hendrix's "extraordinary hostility, verbal and physical aggression, intimidation and targeting of" him on August 8, 2016, "was sufficiently severe so as to alter the conditions of" Mr. Nelson's "employment and create an abusive working environment." *Id.* He further alleged that he "suffered humiliation in front of his peers, mental pain, anguish and emotional distress, damage to his reputation, and loss of future employment opportunities and/or advancement," and continues to suffer "emotional distress . . . to this day." *Id.* at 16.

2. **Dismissal**

Postmaster DeJoy moved to dismiss the fourth amended complaint under Federal Rule of Civil Procedure 12(b)(6). Relying on the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)*, he argued the complaint failed to state a claim for (1) racial discrimination because it did not allege that Mr. Nelson suffered any adverse employment action, or (2) hostile work environment because it did not allege that the incident altered the terms, conditions, or privileges of Mr. Nelson's employment.

The district court granted the motion and dismissed Mr. Nelson's claims without prejudice. The court concluded, that, under the *McDonnell Douglas* framework, Nelson failed to sufficiently allege that he suffered an adverse

6

employment action.[1]  It rejected Mr. Nelson's theory that Mr. Hendrix's actions toward him significantly risked humiliation, damage to reputation, or a concomitant harm to his future employment prospects.  The court noted the absence of arrests or charges.  It further noted that the incident was not made public "beyond being witnessed by the 20 employees present at" the Station "the morning of August 8, 2016."  *Id.* at 57.  Because Mr. Nelson alleged "no concrete facts detailing how [his] future employment opportunities or advancements were impacted," the court concluded that he "experienced no adverse employment action under his first theory." *Id.*

As for the HWE claim, the district court concluded that "Mr. Hendrix's behavior on the morning of August 18, 2016 standing alone did not create a hostile work environment in violation of Title VII."  *Id.* at 63.  It agreed with Postmaster DeJoy that the incident was "single, isolated, [and] non-egregious."  *Id.* at 60.

Mr. Nelson now appeals, challenging the dismissal of his two Title VII claims.

## II. **DISCUSSION**

We review de novo a district court's decision to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6).  *Doe through Doe v. Rocky Mountain Classical Acad.*, 99 F.4th 1256, 1259 (10th Cir. 2024).  Under Federal Rule of Civil

---

[1] To set forth a prima facie case of discrimination under the *McDonnell Douglas* burden-shifting framework, a plaintiff must establish that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he qualified for the position at issue, and (4) he was treated less favorably than others not in the protected class.  *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has interpreted this to mean that, to withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain enough allegations of fact, taken as true, "to state a clam to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

## A. *The Supreme Court's Decision in* Babb

Before reviewing Mr. Nelson's claims, we pause briefly to discuss the Supreme Court's decision in *Babb v. Wilkie*, 589 U.S. 399 (2020), and its potential impact on this appeal. In *Babb*, the Supreme Court interpreted "[t]he federal-sector provision of the" Age Discrimination in Employment Act of 1967, 29 U.S.C. § 633a(a), which "provides (with just a few exceptions) that 'personnel actions' affecting individuals aged 40 and older 'shall be made free from any discrimination based on age.'" 589 U.S. at 402 (quoting § 633a(a)). The Court rejected the notion that this statutory provision "imposes liability only when age is a 'but-for cause' of the personnel action in question." *Id.* Instead, the provision "demands that personnel actions be untainted by any consideration of age." *Id.*

Since *Babb* was issued, the Seventh and Eleventh Circuits have concluded "that *Babb*'s causation standard applies equally to 42 U.S.C. § 2000e-16," Title VII's

8

federal-sector provision. *Huff v. Buttigieg*, 42 F.4th 638, 645 (7th Cir. 2022); *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1205 (11th Cir. 2021). The Eleventh Circuit has also, in light of *Babb*, expressly abandoned the framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for assessing federal-sector age-discrimination claims. *Buckley v. Sec'y of Army*, 97 F.4th 784, 794 (11th Cir. 2024). To date, we have not addressed these issues.

The parties and the district court relied on the *McDonnell Douglas* framework in assessing whether Mr. Nelson, a federal employee proceeding under the federal-sector provision of Title VII, stated a valid claim for relief. Now, on appeal, the parties continue their reliance on the *McDonnell Douglas* framework. Neither party cites, let alone discusses the potential impact of, *Babb*.

We conclude it is unnecessary for us to resolve whether *Babb*'s causation standard applies to Mr. Nelson's Title VII claims or, relatedly, whether the *McDonnell Douglas* framework continues to apply to claims brought under Title VII's federal-sector provision. That is because the outcome of this appeal is the same whether we apply pre-*Babb* standards or whether we conclude, as have the Seventh and Eleventh Circuits, that those standards are incompatible with *Babb*.[2]

As we discuss below, we agree with the district court that Mr. Nelson's claim for race discrimination failed to adequately allege that he was subject to an adverse

---

[2] We take note of *Babb* and its potential impact on this case, rather than simply applying our pre-*Babb* precedent, to avoid any suggestion that we have implicitly resolved the impact of *Babb* on Title VII federal-sector cases.

employment action or that defendant took any personnel action against him. We also agree with the district court that he failed to adequately allege under our precedent that Mr. Hendrix's conduct was so severe or pervasive as to alter the terms or conditions of Mr. Nelson's employment, or that Mr. Hendrix's conduct involved or resulted in any personnel action concerning Mr. Nelson.

## B. *Mr. Nelson's Title VII Claims*

### 1. **Race Discrimination**

The fourth amended complaint attempted to allege race-based disparate treatment of Mr. Nelson as a federal employee of USPS. This claim arises under 42 U.S.C. § 2000e-16(a), Title VII's federal-sector provision, which provides that "[a]ll personnel actions affecting employees . . . in the United States Postal Service . . . shall be made free from any discrimination based on race." 42 U.S.C. § 2000e-16(a).

As noted, the parties and the district court focused on whether Mr. Nelson sufficiently alleged that he suffered an adverse employment action. They relied on the burden-shifting framework of *McDonnell Douglas*, which we have traditionally used to assess Title VII discrimination claims, including in the setting of a Rule 12(b)(6) motion, to dismiss a complaint. *See Khalik*, 671 F.3d at 1192. The district court, despite emphasizing that Mr. Hendrix's alleged conduct "was inappropriate and offensive," concluded that Mr. Nelson failed to allege that he suffered an adverse employment action. Aplt. App. at 58. The court noted there were "no concrete facts" alleged "detailing how" Mr. Nelson's "future employment opportunities or

10

advancements were impacted" by Mr. Hendrix's conduct. *Id.* at 57. It said Mr. Nelson failed to "provide any detail about how his duties or working conditions actually changed" as a result of Mr. Hendrix's alleged conduct. *Id.* at 59. We agree with the district court.

We have liberally defined the phrase "'adverse employment action,'" *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032 (10th Cir. 2004), holding "that the filing of false criminal charges" can constitute "an 'adverse employment action' because such an act causes harm to future employment prospects." *Id.* (quotations omitted). We explained that an adverse employment action "encompass[es] those acts that carry a significant risk of humiliation, damages to reputation, and a concomitant harm to future employment prospects." *Id.* (quotations and emphasis omitted).

Mr. Nelson repeated those statements in his fourth amended complaint and his appellate brief. But he otherwise failed to allege any details reasonably suggesting that Mr. Hendrix's conduct, which included calling 911 but not actually filing criminal charges against Mr. Nelson, carried a significant risk of humiliation to Mr. Nelson, a risk of damage to his reputation, or any type of harm to his future employment prospects.[3] We therefore agree with the district court that Mr. Hendrix's

---

[3] Mr. Nelson does not allege that Mr. Hendrix's conduct resulted in any change in his employment status, such as a firing, failure to be promoted, reassignment with different responsibilities, or any decision causing a significant change in his benefits. *See Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1222 (10th Cir. 2022).

conduct, though inappropriate and offensive, did not result in an adverse employment action involving Mr. Nelson.

We also conclude that Mr. Nelson's first claim failed to allege that any personnel action occurred in connection with, or as a result of, Mr. Hendrix's actions. Although the term "personnel action" is not defined in § 2000e-16, "[t]he Civil Service Reform Act of 1978, which governs federal employment, broadly defines a 'personnel action' to include most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews." *Babb*, 589 U.S. at 405 (citing 5 U.S.C. § 2302(a)(2)(A)). "That interpretation is consistent with the term's meaning in general usage." *Id.* Thus, for purposes of this appeal, we will "assume that it has the same meaning under" Title VII. *Id.*

To quote from the statute, the term "'personnel action'" includes: "an appointment"; "a promotion"; disciplinary or corrective actions; "a detail, transfer, or reassignment"; "a reinstatement"; "a restoration"; "a reemployment"; "a performance evaluation"; "a decision concerning pay, benefits, or awards, or concerning education or training"; "a decision to order psychiatric testing or examination"; "the implementation or enforcement of any nondisclosure policy, form, or agreement"; and "any other significant change in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A)(i)–(xii).

Nowhere in the fourth amended complaint did Mr. Nelson allege that any of these actions occurred. He alleged that Mr. Hendrix's conduct posed a risk of humiliation, a risk of damage to his reputation, and potential harm to his future

12

employment prospects. But these allegations were too vague and conclusory to sufficiently allege a significant change in Mr. Nelson's duties, responsibilities, or working conditions. We therefore conclude that the fourth amended complaint failed to allege that Mr. Hendrix's conduct resulted in any personnel action affecting Mr. Nelson.

The district court did not err in dismissing Mr. Nelson's race discrimination claim.

2. **Hostile Work Environment**

The fourth amended complaint also attempted to allege an HWE Title VII claim under the federal-sector provision based on race-based harassment.

To state an HWE claim, a plaintiff must allege: "(1) membership in a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was due to race; and (4) the harassment was so severe or pervasive that it altered a term, condition, or privilege of his employment and created an abusive environment." *Young v. Colo. Dep't of Corr.*, 94 F.4th 1242, 1249 (10th Cir. 2024); *see Hall v. U.S. Dep't of Labor, Admin. Rev. Bd.*, 476 F.3d 847, 851 (10th Cir. 2007) (applying same test to federal-sector HWE claim brought by former civilian employee of the United States Army).

We focus on the "severe or pervasive" fourth element. In doing so, "we must consider a variety of factors," including "the frequency of the discriminatory conduct," "its severity," "whether it is physically threatening or humiliating, or a

13

mere offensive utterance," and "whether it unreasonably interferes with an employee's work performance." *Young*, 94 F.4th at 1249–50.

To show pervasiveness, a plaintiff must allege "more than a few isolated incidents" of unwelcome harassment, *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (internal quotation marks omitted)), and instead must allege facts showing that the workplace was "permeated with discriminatory intimidation, ridicule, and insult," *Young*, 94 F.4th at 1249 (internal quotation marks omitted).  That said, we also have concluded that "a single event, if extraordinarily severe, can alter the conditions of a working environment." *Young*, 94 F.4th at 1250; *see Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1243 (10th Cir. 2001) (affirming jury's finding that a hostile work environment was created when a male patient sexually assaulted a female psychologist).

The fourth amended complaint does not plausibly allege pervasiveness.  The incident occurred during the morning of August 8, 2016.  The alleged harasser, Mr. Hendrix, was unknown to Mr. Nelson and had only temporary managerial authority over him.  Mr. Nelson thus was not subjected to frequent harassment or a to workplace permeated with discriminatory conduct.  *E.g.*, *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1213–14 (10th Cir. 2015) (plaintiff alleged repeated racial harassment from coworkers and her supervisor, including the use of the n-word, condoning lynching, use of race-based stereotypes, and other offensive racist terms); *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1135–37 (10th Cir. 2008) (plaintiff alleged a variety of racial harassment at his workplace, including use of the n-word, racist

14

cartoons posted on company billboards, a coworker using a derogatory name for a black manager, and the prominent display of a life-sized hangman's noose).

The fourth amended complaint also does not establish severity. The allegations imply the incident was physically threatening because of the size differential between Mr. Hendrix and Mr. Nelson. *See* Aplt. App. at 8 ("Mr. Hendrix is approximately 6 feet, 2 inches tall" and "approximately 8 inches taller than Mr. Nelson, who is 5 feet, 6 inches tall."). The complaint also alleges that Mr. Hendrix "aggressively approached" Mr. Nelson and later "charged at Mr. Nelson and ordered him" into a manager's office. *Id.* at 9. It lacks a suggestion, however, that Mr. Hendrix touched Mr. Nelson or threatened to touch or harm him. Further, Mr. Hendrix's conduct, at most, only temporarily interfered with Mr. Nelson's work.

Mr. Nelson alleges he "immediately began suffering emotional distress upon seeing the police officers and as a result of Mr. Hendrix's aggression, hostility and abuse," and that he took sick leave the following day "in order to allow him to seek treatment" for those symptoms. *Id.* at 11, 13. There are no allegations, however, that Mr. Nelson continued to suffer from these symptoms or that Mr. Hendrix's conduct caused any lasting impact on Mr. Nelson's work environment. We therefore are not persuaded that a reasonable person in Mr. Nelson's position would have perceived Mr. Hendrix's conduct as so severe that it altered the conditions of the work environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or

15

abusive—is beyond Title VII's purview."). Though offensive, Mr. Hendrix's conduct was not severe enough under our precedent to state an HWE claim.[4] *See Throupe v. Univ. of Denver*, 988 F.3d 1243, 1255 (10th Cir. 2021) ("We have found conduct sufficiently severe" to state a valid HWE claim for relief "in only particularly threatening or humiliating circumstances.").

## III. **CONCLUSION**

We affirm the district court's judgment.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

---

[4] *See Morris v. City of Colo. Springs*, 666 F.3d 654, 665–669 (10th Cir. 2012) (concluding that male surgeon's actions, which included twice flicking the plaintiff's head with his finger and separately throwing bloody heart tissue at her that struck her leg, was not sufficiently severe to alter the terms or conditions of her employment); *Turnbull*, 255 F.3d at 1242, 1244–45 (affirming jury's finding that a hostile work environment was created when a female psychologist was sexually assaulted by a male patient); *Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1023 (10th Cir. 2001) (concluding that conduct of plaintiff's supervisor, who "made aggressive sexual advances to" plaintiff and, "against her will, intimately touched her body and forced her to masturbate him," was sufficiently severe to alter the conditions of plaintiff's employment); *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir. 1998) (concluding that the conduct of two restaurant customers, who grabbed the plaintiff's "hair and breast while she attempted to take their orders and serve their beer," was "physically threatening and humiliating behavior which unreasonably interfered with [her] ability to perform her duties as a waitress").